Darrell W. STEVENS, Petitioner,

v.

DELAWARE CORRECTIONAL CENTER, et al., Respondents.

No. CIV.A. 97–130–GMS.

United States District Court, D. Delaware.

July 23, 2001.

---

Charles M. Oberly, III, and Ann–Marie P. Sheely, of Oberly, Jennings & Drexler, Wilmington, Delaware, for Petitioner.

Deputy Attorney General Thomas E. Brown, of the Delaware Department of Justice, Wilmington, Delaware, for Respondents.

### OPINION

SLEET, District Judge.

## I. INTRODUCTION

On February 15, 1991, following a jury trial in the Delaware Superior Court, the petitioner, Darrell W. Stevens, was convicted of unlawful sexual intercourse in the first degree. *See* 11 Del. C. § 775 (1990).[1] He was sentenced to life in prison without benefit of parole for the first twenty years. On June 17, 1992, the Delaware Supreme Court affirmed his conviction and sentence. *See Stevens v. State*, 610 A.2d 727 (Table), 1992 WL 151317 (Del. June 17, 1992) ("*Stevens I* "). His pro se motion for post conviction relief was denied by the Superior Court in July, 1995. *See State v. Stevens*, ID. No. 90K01116DI, 1995 WL 465149 (Del.Super.Ct. July 18, 1995) ("*Stevens II* "). The Delaware Supreme Court affirmed that denial in January, 1996. *See Stevens v. State*, 676 A.2d 907 (Table), 1996 WL 69769 (Del. Jan.24, 1996) ("*Stevens III* "). Stevens is currently incarcerated at the Delaware Correctional Center ("D.C.C.") located in Smyrna, Delaware.

On March 20, 1997, Stevens, acting through counsel, filed a petition for the issuance of a writ of habeas corpus with the court pursuant to 28 U.S.C. § 2254. In his petition, Stevens claims that he was denied the effective assistance of counsel at trial. He contends that his trial counsel, Dennis A. Reardon, was ineffective in several ways. Each of the alleged deficiencies relate to inadequate investigation or preparation of the case prior to trial. Upon concluding that Stevens' petition raised serious questions as to whether Reardon's performance was constitutionally deficient, the court conducted a limited evidentiary hearing on September 5, 2000. For the reasons that follow, the court will conditionally grant Stevens' petition.

## II. FACTUAL BACKGROUND

Stevens was convicted of raping[2] Tracey Auterson shortly after midnight on Friday, March 16, 1990. Auterson had been at a bar, Mr. D's Pizza & Restaurant ("Mr. D's"), from approximately 4:00 p.m. until approximately 11:30 p.m. At approximately 11:30 p.m., Auterson called her boyfriend, Marvin Lindsay, at his home and asked if she could stay with him that night.[3] He said she could. She then asked Lindsay if he would come pick her up at the bar. He declined. After speaking with Lindsay, Auterson set out to walk to his trailer home, about a fifteen minute walk from Mr. D's. On the way home, Auterson claims that she was grabbed from behind, dragged into an apple orchard, and forcibly raped. Auterson stated that she was

---

**1.** In 1998, the Delaware General Assembly repealed 11 Del. C. §§ 773, 774, and 775—unlawful sexual intercourse in the third, second, and first degree, respectively. Those offenses (and three other offenses for various degrees of unlawful sexual penetration) were replaced with new §§ 770, 771, 772 and 773—rape in the fourth through first degree. Furthermore, the felony classifications of §§ 773, 774, and 775 changed for all crimes committed "as of 12:01 a.m., June 30, 1990, or thereafter." Since the former statutes remain in effect for all crimes committed before main in effect for all crimes committed before

the effective date of the changes, all references herein to Delaware statutes refer to the statutes in effect at the time of Stevens' offense unless otherwise indicated.

**2.** For the sake of brevity, the court will refer to "rape" rather than "unlawful sexual intercourse." *But see* note 1, *supra*.

**3.** Auterson had previously lived with Lindsay but had moved out earlier in the week because she and Lindsay had been fighting.

unable to identify her attacker because she was lying on her stomach part of the time and was told to keep her eyes closed when she was later rolled over onto her back. Auterson testified that at one point during the struggle, she scraped her attacker's genitals with her fingernails.

After the assailant fled, Auterson ran out of the orchard. Auterson testified that she left the orchard at approximately 2:20 a.m., though her testimony is somewhat vague as to what occurred during the approximately two hour period after she was first accosted.[4] Auterson then went to Lindsay's trailer. She told him that she had been raped. Lindsay noted that Auterson's clothes were in disarray and that she was upset. Lindsay testified, however, that at the time he was not sure whether he believed her story. It took Lindsay about a half hour to calm Auterson down. Afterward, they both went to sleep. Lindsay left for work at about 3:30 a.m. that morning (March 17). After discussing the incident with his co-workers, Lindsay called Auterson at approximately 8:00 a.m. and told her that she should report the rape to the police. According to Auterson, Lindsay told her that if she did not call the police she should go to her mother's house.

At about 9:00 a.m., Auterson returned to the scene of the rape. Auterson testified that she did this because she needed a cigarette and believed that she must have lost her cigarettes in the orchard. While there, she found the pink tank top that she had been wearing the previous evening. She then became frightened and returned to Lindsay's trailer. After Lindsay got home from work at about 2:00 p.m., Auterson called the police. Detective Young interviewed Auterson that afternoon at Lindsay's home. Lindsay was present during the interview. Young and Auterson then returned to the orchard where they found her panties and a blue "clutch purse." Young opened the clutch purse and found a checkbook belonging to "Darrell W. Stevens." Auterson told Young that she did not know anyone by that name. She could not identify Stevens at trial (or, apparently, beforehand)[5] because she did not get a good look at him during the assault. However, semen was removed from Auterson's vagina and blood was found on her skirt. DNA testing revealed that the semen "matched" Stevens' DNA. The blood found on Auterson's skirt was "consistent with" Stevens' blood type, but not Auterson's.[6] The prosecution ar-

---

4. From Auterson's description of the actual sexual assault, the incident did not appear to last for a long period of time. She testified, however, that she fainted at some point during the incident. When she regained consciousness, the assailant was still with her.

5. After Detective Young and Auterson returned to the apple orchard, they went to the hospital for a physical examination and then to the police station. At that time, Detective Young reinterviewed Auterson, this time on audiotape. Although that tape was played for the jury, the trial transcript does not reflect the content of the tape. A portion of the interview transcript was attached to Stevens' motion for post-conviction relief and is part of the record before the court. That portion appears to indicate that Auterson could not

give Detective Young a physical description of her assailant. Indeed, Auterson testified at trial that she did not know whether her attacker was black, white, or otherwise.

6. There was no testimony regarding the *mathematical* probability of either a DNA match or of a "consistent" blood type. With respect to the extent of the DNA match of semen in this case, the DNA expert stated that it was "unlikely for two unrelated individuals in the population to share a given profile across at least three probes" (three probes refers to the extent of matching DNA found by the expert). The blood type expert gave no description whatsoever (mathematical or otherwise) as to the probabilities regarding the blood found on Auterson's skirt being "consistent with" that of Stevens.

gued that the presence of blood corroborated Auterson's claim that she scraped her attacker's genitals during the struggle.[7]

Auterson testified that she had never seen Stevens before, had never dated him or socialized with him, and had not danced with him on the night in question. Auterson also testified that, although she had been at Mr. D's for more than seven hours, she only consumed about one and a half glasses of beer. Auterson acknowledged that she was "buzzed" when she left the bar, but testified that she was not "seriously impaired."

Stevens testified that he was also at Mr. D's on March 16, 1990. According to Stevens, he got very drunk and was unable to remember anything after leaving the bar.[8] He testified that he was "fairly certain" that he left the bar alone. His next memory, however, was waking up the following morning in a driveway behind the bar, his wallet missing. He further testified that he did not know Auterson, though he may have seen her at Mr. D's on March 16. He did not recall dancing with her.

Because Stevens claimed that he blacked out after leaving Mr. D's, he could not affirmatively deny engaging in sexual intercourse sex with Auterson. Instead, the theory of defense at trial seemed to be that if he had intercourse with her, it must have been consensual. Reardon suggested to the jury that Auterson must have lied to Lindsay about being raped in order to cover up her philandering. Stevens testified that he is not a violent drunk. That testimony was corroborated by the testimony of a former girlfriend of Stevens, Maureen Stokes.

The defense also called two witnesses who were present at Mr. D's on the evening in question. Kathy Theodorakos, the owner of Mr. D's, testified that she was only at the bar for a short time that evening. She testified that she saw Stevens sometime between 9:00 and 9:30 p.m. and that he was not drunk at that time. Karen Cates, a friend of Stevens, testified that she saw him dancing that evening with a group of people that included Auterson. She did not, however, see him dancing with Auterson one-on-one. She testified that when she saw Stevens dancing, at approximately 10:00 p.m., he appeared to be drunk or "high" but was not falling down or stumbling. Cates also testified that when she was driving home at about 11:00 p.m., she saw Stevens walking by himself in a direction toward his home (which was away from the apple orchard).

Upon Stevens' arrest on March 19, 1990, the police found a scrape, sore, or abrasion of some sort on his scrotum. A photograph of this mark was shown to the jury.[9] The prosecution argued that this mark corroborated Auterson's claim that she scraped her attacker.[10] According to the

---

7. Detective Young testified that he did not take fingernail scrapings from Auterson to substantiate her claim because she had washed her hands after the assault.

8. Stevens testified that he drank approximately four pitchers of beer and perhaps one or two shots of alcohol that evening.

9. The photograph has not been submitted to the court. At trial, the officer who took the photograph (Corporal Yeomans) testified that he "observed this mark on [Stevens'] scrotum which appeared to be some type of a wound or abrasion, laceration, what have you." Detective Young (the lead investigator), when asked during cross-examination whether the photo showed a "sore" or a "scratch," described the mark as "a scratch, sore, whatever you want to call it."

10. When Auterson initially reported the rape to Detective Young, she said that she had scraped her assailant's penis. During cross-examination of both Auterson and Detective Young, Reardon brought out that there was

prosecution, the claim was further corroborated by the blood found on Auterson's skirt. Thus, in the prosecution's view, the mark undermined Stevens' consensual sex theory.

Stevens testified that he believed the mark on his scrotum was a herpes sore, not a scratch from Auterson. He further testified that he had a "history" of herpes. It appears, however, that he was referring to having previously been diagnosed with a form of herpes in or near his eye. *See* 2/13/91 Tr. at 32. Stevens has attached to his habeas petition a 1984 medical record that seems to indicate that he was diagnosed at that time with some form of herpes simplex in the eye area. This medical record was not presented at trial, nor was any medical expert testimony provided (by either side) to explain the origin of the mark on Stevens' scrotum. Reardon tried to corroborate Stevens' claim of a "history" of herpes through the testimony of Stokes, Stevens' former girlfriend. That attempt backfired badly. Reardon had apparently not discussed his intention to question Stokes on this subject with her before she testified. When he examined Stokes on the witness stand, she said she was unaware that Stevens had ever had herpes. The prosecution emphasized this point on cross-examination of Stokes. Remarkably, Reardon revisited the issue on redirect. She again denied ever knowing that Stevens had herpes, despite having been in a close and intimate relationship with Stevens for approximately one year. She testified that she was surprised by the question regarding herpes.

The jury found Stevens guilty on the charge of unlawful sexual intercourse in the first degree but not guilty on two

counts of sexual penetration in the second degree.[11] As previously noted, the conviction was affirmed on appeal and Stevens' motion for post conviction relief was denied by the Delaware state courts.

## III. DISCUSSION

Stevens' only asserted ground for relief is ineffective assistance of counsel. He claims that Reardon was ineffective in the following six ways:

1. He failed to properly investigate the existence of potentially favorable defense witnesses;

2. He failed to hire a private investigator as he promised to do;

3. He failed to investigate Lindsay's work schedule, which would have turned up a discrepancy in Lindsay's testimony;

4. He failed to obtain medical records or expert testimony to show that the mark on Stevens' scrotum was due to his herpes condition, not from being scratched by Auterson;

5. He failed to effectively communicate with Stevens prior to trial, failed to keep him apprised of the status of the case, and never visited him at the D.C.C. where he was incarcerated prior to trial; and

6. He failed to obtain fingerprints from Stevens' wallet to determine whether Auterson's fingerprints were present (which, Stevens contends, would have supported his claim that Auterson must have stolen his wallet and planted it at the scene).

---

no mark on Stevens' penis; the mark was on his scrotum.

**11.** The sexual penetration charges were based on allegations that, prior to intercourse, Stevens inserted his fingers into Auterson's vagina and anus.

## A. Exhaustion of State Remedies

██ A federal petition for a writ of habeas corpus may not be granted to a person incarcerated pursuant to a state court judgment unless he has first exhausted remedies that are available in state court. *See* 28 U.S.C. § 2254(b)(1); *Lambert v. Blackwell,* 134 F.3d 506, 513 (3d Cir.1997). To satisfy the exhaustion requirement, the petitioner must "fairly present" his federal claims to state courts before bringing them in federal court. *See McCandless v. Vaughn,* 172 F.3d 255, 260 (3d Cir.1999) (citations omitted). State remedies are not deemed exhausted if the petitioner "has the right under the law of the State to raise, by any available procedure, the question presented." *See* 28 U.S.C. § 2254(c). When an issue has been presented to a state's highest court on direct appeal, however, it need not be reasserted in a state post-conviction proceeding. *See Lambert,* 134 F.3d at 513 (citations omitted).

██ If a claim has not been "fairly presented" to the state courts but state procedural rules bar the petitioner from seeking further relief, the exhaustion requirement is deemed satisfied. *See McCandless,* 172 F.3d at 260; *see also* 28 U.S.C. § 2254(b)(1)(B)(i) (federal relief not barred where "there is an absence of available State corrective process"). Under those circumstances, however, federal courts may not consider the merits of such claims unless the petitioner can establish "cause and prejudice" or a "fundamental miscarriage of justice" to excuse the procedural default. *See McCandless,* 172 F.3d at 260 (citing *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640

(1991)); *see also Toulson v. Beyer,* 987 F.2d 984, 987 (3d Cir.1993).

██ The Respondents concede that Stevens has exhausted state remedies with respect to his first four claims of ineffective assistance. They contend, however, that the court should not consider certain affidavits that Stevens submitted to support those claims (specifically, his first two claims regarding failure to investigate favorable witnesses and hire a private investigator). With the exception of one of the affidavits, the court does not agree.

These affidavits do not offer factual or legal theories that were not presented to the state courts with Stevens' motion for post-conviction relief. *See McCandless,* 172 F.3d at 261 (stating that "[t]o 'fairly present' a claim, a petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted."); *Gibson v. Scheidemantel,* 805 F.2d 135, 138 (3d Cir.1986) (stating that "[b]oth the legal theory and the facts on which a federal claim rests must have been presented to the state courts") (citations omitted). Instead, the affidavits merely recite facts that were already submitted to the state courts in the form of either letters from the affiants or interview notes from private investigators hired by Stevens' mother after the trial. As such, the court will not disregard the affidavits.[12] *Cf. Vasquez v. Hillery,* 474 U.S. 254, 257–60, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (permitting consideration of affidavits and other evidence that did not "fundamentally alter the legal claim already considered by the state courts" and did not suggest that petitioner had "deliberately with[held] es-

---

**12.** The one exception noted above is an affidavit of Bernard Henry. The affidavit states that Henry saw Stevens and Auterson dancing together at Mr. D's on the night in question.

Henry, however, does not appear to have been identified in any form in Stevens' submissions to the state courts. The court will, therefore, disregard Henry's affidavit.

sential facts from the state courts" in attempt to expedite federal review).

 Stevens concedes that he has failed to exhaust state remedies with respect to his last two ineffective assistance claims (inadequate pretrial communication with Stevens and failure to obtain fingerprint analysis of wallet).[13] He also agrees with the Respondents that these claims would now be procedurally barred in the state courts. A petition that contains unexhausted but procedurally barred claims in addition to exhausted claims is not a "mixed petition" requiring dismissal. *See McCandless*, 172 F.3d at 260; *Toulson*, 987 F.2d at 987. As Stevens has clearly failed to satisfy either the "cause and prejudice" or "fundamental miscarriage of justice" exceptions to the exhaus-

tion requirement, these claims cannot be considered.[14]

## B. Standard of Review for Exhausted Claims

 The Anti–Terrorism and Effective Death Penalty Act of 1996 (AEDPA) altered the standard of review that a federal habeas court must apply with respect to a state prisoner's claim that was adjudicated on the merits in state court. *See Williams v. Taylor*, 529 U.S. 362, 402–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (interpreting 28 U.S.C. § 2254(d)(1)); *see also Dunn v. Colleran*, 247 F.3d 450, 457 (3d Cir.2001) (explaining *Williams*). Under the AEDPA, the court may not issue a writ of habeas corpus based on such a claim unless the state court adjudication "resulted in a decision that was contrary to, or in-

---

**13.** It is not clear to the court that Stevens did not, in fact, exhaust state remedies with respect to his fifth claim—failure to adequately communicate with Stevens prior to trial. The parties agree that Stevens raised this matter in his motion for post-conviction relief in the Superior Court. They also agree that Stevens failed to argue this point to the Delaware Supreme Court. Although it is true that a petitioner does not satisfy the exhaustion requirement merely by presenting his arguments to lower state courts, it appears that the parties may be unduly parsing Stevens' ineffectiveness of counsel claim. To the extent that Reardon's failure to keep Stevens apprised of the progress of his trial preparation efforts hindered Reardon's ability to identify favorable defense witnesses, it would not seem that a failure to specifically argue this point before the Delaware Supreme Court bars its consideration now. To the extent Stevens intends to raise this "ineffective pretrial communication" claim as an independent basis for relief, however, the court accepts the parties' views that such claim is unexhausted.

**14.** As to "cause," Stevens argues that because the Superior Court rejected these claims, he believed that the Delaware Supreme Court would also reject them "[d]ue to the deference that will always be conferred to an attor-

ney's affidavit as opposed to a pro se prisoner's arguments." *See* Pet. Op. Br. at 23, 25. The mere subjective belief that raising an argument in the state courts would be futile, however, does not constitute "cause." *See Engle v. Isaac*, 456 U.S. 107, 130, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982).

As to the "miscarriage of justice" exception, Stevens notes that he has always maintained his innocence. He contends that his innocence would have been established if Reardon had presented to the jury the evidence Stevens later developed. *See* Pet. Op. Br. at 24, 26. But Stevens has developed no evidence with respect to his fifth and sixth claims that is not properly before the court on his first four claims, which the parties agree have been exhausted. Thus, if the court were to find his exhausted claims to be meritless, it is unclear how the same evidence could satisfy the "miscarriage of justice" exception for his unexhausted claims. Further, none of the evidence Stevens presents would be sufficient to satisfy the demanding burden applicable to the "miscarriage of justice" exception. *See Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) (concluding that "[t]o establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.").

volved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *See* 28 U.S.C. § 2254(d)(1). In *Williams,* the Supreme Court interpreted this provision as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams,* 529 U.S. at 412–13, 120 S.Ct. 1495. The Court further explained that under the "unreasonable application" clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *See id.* at 412, 120 S.Ct. 1495.

■ The "clearly established federal law" applicable to Stevens' claims of ineffective assistance of counsel is the familiar two prong test the Court articulated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See, e.g., Williams,* 529 U.S. at 390–91, 120 S.Ct. 1495. Under *Strickland,* Stevens must first establish that Reardon's performance was constitutionally deficient by showing that his representation "fell below

an objective standard of reasonableness." *See Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052. Second, Stevens must show that Reardon's deficient performance prejudiced his defense. As the Court stated:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome .... When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.

*Id.* at 694–95, 104 S.Ct. 2052.

In this case, the Delaware courts identified the proper standard under *Strickland. See Stevens III,* 1996 WL 69769, at *2. The issue now presented, therefore, is whether the state courts' application of that standard to the facts of this case was unreasonable. The court concludes that it was.

## C. Failure to Investigate Potential Witnesses/Failure to Hire Private Investigator

Stevens' strongest claims are his first two—i.e., that Reardon made an inadequate effort to identify favorable witnesses and failed to follow through on his alleged promise to hire a private investigator. Because the purpose of hiring the private investigator would have been to assist with the identification of favorable witnesses, *see* Pet. Op. Br. at 18, these two claims are, in reality, a single claim.[15]

When Stevens' mother, Peggy Lane, hired Reardon to represent her son, it was

---

**15.** The relevant issue is whether Reardon was deficient in failing to identify favorable witnesses. Reardon's alleged failure to hire a private investigator to assist in that endeavor is simply part of the inquiry into whether his efforts to identify witnesses were constitutionally deficient.

her understanding that Reardon was going to hire a private investigator to attempt to locate potentially favorable witnesses. This step was to be undertaken because Stevens had little memory of the evening in question (due to his heavy drinking that night). As such, he could provide almost no information to assist Reardon in finding people who were at Mr. D's on the night of the alleged rape. Lane contends that she agreed to pay the investigator's fees. Reardon did not hire an investigator. Stevens maintains that he and his mother were not aware that Reardon had not done so until the first day of the trial.

After Stevens was convicted, Lane hired two private investigators to try to identify individuals with information relevant to her son's case. In his state court motion for post-conviction relief, Stevens identified various individuals located by these investigators. He attached the investigators' summaries of their interviews with these individuals to his motion and also submitted letters from three individuals. *See* State Mot. for Post–Conviction Relief (MPCR) Ex. F—M. Although the letters and interview notes include attacks on Auterson's reputation for promiscuity, they also include information from people claiming to have been present at Mr. D's on the night in question. Several of these individuals claimed to have seen Stevens and Auterson dancing and socializing together at the bar. One person, Richard Saseen, claimed that he saw Auterson and Stevens dancing and drinking together, that they were both drunk, and that she was kissing him. *See* MPCR Ex. I. Two others, Jan and Randy Miller, claimed that they saw Stevens and Auterson dancing and drinking together, that Auterson appeared to be

drunk and was kissing Stevens, and that they left the bar together. *See* MPCR Ex. K. Another is Patty Paolini, the bartender at Mr. D's on the night of the incident. Although her shift ended early (she was gone by about 7:00 p.m.), Paolini claims that she served two pitchers of beer to Auterson and a friend (not Stevens), and that Auterson appeared to be intoxicated. *See* MPCR Ex. H.[16]

Stevens also attached to his state court motion a letter from Lane (his mother) describing her conversation with Theodorakos (the owner of Mr. D's). As noted above, Theodorakos was present at Mr. D's on the night of the alleged rape but left by around 9:30 p.m. According to Lane's letter, Reardon met with Theodorakos at Mr. D's prior to trial, at which time she gave him the names of additional people he should contact. Reardon, however, merely left his business cards with Theodorakos and asked her to pass them out and have people call him.

### 1. The State Courts' Disposition of Stevens' Motion for Post–Conviction Relief

The Superior Court ordered Reardon to file a response to Stevens' ineffective assistance of counsel claims. In the affidavit he submitted, Reardon noted that because of the degree of Stevens' intoxication and his memory lapse, Stevens "was unable to give me anything to work on as far as forming a defense." *See* Stevens' Br. to Del. S.Ct., App. at 11–14. Reardon states that after reviewing the evidence and technical reports and talking to witnesses, he concluded that "the only defense possible was to attempt to persuade the jury that [Auter-

---

**16.** Two other people interviewed by one of the investigators, Sandy Manning and Rick Clark, apparently reported that Auterson was "hanging all over" Stevens and kissing him on the night in question. However, the inves- tigator noted his suspicions regarding the validity of Clark's story. In Stevens' federal petition, his attorneys do not rely on either Manning's or Clark's statements.

son] consented to sex with Mr. Stevens, then she attempted to cover herself by telling her boyfriend she was raped." Reardon's affidavit then identifies ten names of possible witnesses provided by Stevens and his mother, and states that "all of the above were contacted by me either personally or by phone prior to trial." His affidavit provides no information as to the extent of these "contacts," what information he obtained from them, what conclusions he drew as to the need for other witnesses or the likelihood that such other witnesses might be available. Reardon's affidavit also did not deny Lane's claim that he simply left business cards with Theodorakos, rather than following up himself with the names she provided to him.[17]

Of the ten names given to him by Stevens and his mother, Reardon claims to have issued subpoenas to five of them. Four testified at trial. Only two—Theodorakos and Cates—testified as to the events at Mr. D's on the night in question. As noted above, Theodorakos was only at Mr. D's for a short time and provided no testimony regarding Auterson. Cates testified that she saw Stevens dancing with a group of people that included Auterson, but she did not see him dancing with Auterson

one-on-one. Cates also provided testimony that was somewhat inconsistent with a consensual sex theory. As noted above, she testified that when she left the bar at around 11:00 p.m., she saw Stevens walking away from the bar alone, in a direction away from the apple orchard.[18]

Stevens filed a response to Reardon's affidavit. See Pet. Op. Br., App. at 19–23. In his response, Stevens noted Reardon's failure to hire a private investigator as promised, and emphasized Reardon's failure to pursue the leads given to him by Theodorakos.

The Superior Court referred the matter to a Commissioner. The Commissioner concluded that Stevens had not established either prong necessary to prevail on an ineffective assistance of counsel claim under *Strickland.* The Superior Court then issued a brief order adopting the recommendation of the Commissioner. Although the Superior Court did not specify its own reasoning, it noted that after a "careful and de novo review of the record," it concurred with and adopted the Commissioner's report and recommendation in full.[19] See *Stevens II*, 1995 WL 465149, at *1.

---

17. In an affidavit submitted with Stevens' federal habeas petition, Theodorakos not only confirms the information stated in Lane's letter, but also adds that she advised Reardon that he should not count on people to call him. She also notes that Reardon did not contact her again after their initial meeting.

18. Because Cates' testimony has Stevens walking toward home, it is inconsistent with both Stevens' and Auterson's version of where Stevens ended up that night. Conceivably, Stevens could have returned to the bar after Cates claims that she saw him walking home. It appears more likely, however, that Cates was either mistaken or lying about seeing Stevens walking towards his home. At trial, the prosecution effectively undermined Cates' credibility in this regard.

19. The court does not intend to suggest that there was anything wrong with the brevity of the Superior Court's order. The Commissioner's report was sixteen pages long. Although the court takes issue with certain aspects of the Commissioner's analysis, the report was sufficiently detailed and explained the basis for the conclusions reached. Since the Superior Court agreed with those conclusions, there was nothing inappropriate in its issuance of a summary order. Rather, the court points out the brevity of the Superior Court's order (and the Delaware Supreme Court's order, discussed below) to explain why it principally focuses on the analysis set forth in the Commissioner's report, rather than the state court orders.

Stevens appealed the denial of his motion to the Delaware Supreme Court. The State responded with a motion to affirm under Delaware Supreme Court Rule 25(a), which authorizes an expedited procedure that may be utilized only when it is "manifest on the face of appellant's brief that the appeal is without merit." *See* Del. S.Ct. R. 25(a). Under this procedure, the State does not file a brief and the appellant may not respond to the motion unless requested to do so. The Delaware Supreme Court granted the state's motion to affirm. *See Stevens III,* 1996 WL 69769.

### 2. The Delaware Courts Unreasonably Applied the Governing Law to the Facts of Stevens' "Failure to Investigate Witnesses" Claim

The Delaware courts' application of the governing law to Stevens' "failure to investigate witnesses" claim was unreasonable. At the outset, it must be acknowledged that the information uncovered by Stevens after his conviction is by no means compelling evidence of his innocence. That Auterson may have been dancing, socializing with, and even kissing Stevens at the bar certainly does not diminish her absolute right to say "no" to a proposition to engage in sexual intercourse. For the reasons set forth below, however, the court concludes that Reardon's failure to investigate witnesses resulted in a "breakdown in the adversarial process that our system counts on to produce just results." *See Strickland,* 466 U.S. at 696, 104 S.Ct. 2052.

### a. Reardon's Efforts to Find Favorable Witnesses were Objectively Unreasonable

 To establish the performance component of his ineffective assistance claim, Stevens must demonstrate that Reardon's performance "fell below an objective standard of reasonableness." *See*

*id.* at 688, 104 S.Ct. 2052. "The proper measure of attorney performance is simply reasonableness under prevailing professional norms." *Id.* In evaluating the performance of counsel, judicial scrutiny is highly deferential. *See id.* at 689, 104 S.Ct. 2052. The court must endeavor to avoid the "distorting effects of hindsight" and must evaluate the conduct from the attorney's perspective at the time he or she selected a particular strategy. *See id.* "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation and citation omitted).

Although distinguishable on its facts, *Strickland* itself involved a "duty to investigate" ineffectiveness claim. The Court noted that there are no special standards in this context, but it did indicate how the presumption of reasonableness factors into this inquiry:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.

*Id.* at 690–91, 104 S.Ct. 2052.

As noted above, Reardon stated in his affidavit that, "[a]fter reviewing the evidence, the various technical reports and talking to witnesses, the only defense possible was to attempt to persuade the jury that [Auterson] consented to sex with Mr. Stevens, then she attempted to cover herself by telling her boyfriend she was raped." The Commissioner accepted that

strategy as reasonable. Given the physical evidence connecting Stevens to the scene of the crime, the court takes no issue with that conclusion.

The challenged conduct, however, is not Reardon's decision to adopt that strategy. Rather, Stevens takes issue with Reardon's inadequate efforts to identify witnesses in support of that strategy. In that regard, Reardon's affidavit simply states that he contacted ten individuals that Stevens and his mother asked him to contact and that he interviewed Lindsay.

The Delaware courts were unduly impressed with Reardon's affidavit. The Commissioner stated that Reardon "followed every lead given him by Stevens." *See* Comm'r Rep't. at 10, *reproduced in Stevens II*, 1995 WL 465149, at \*1. The Delaware Supreme Court similarly noted that Reardon's affidavit "avers that he investigated all of the leads provided to him by Stevens." *See Stevens III*, 1996 WL 69769, at \*2. The court does not mean to quibble over choice of words, but these characterizations of Reardon's affidavit are rather generous. He did not state that he "followed" or "investigated" the leads provided by Stevens. On the contrary, Reardon merely stated that the individuals that Stevens and his mother identified were "contacted by me, either personally or by phone."

As noted above, Reardon's affidavit gives no clue as to the extent of these "contacts," or whether the information he learned in this manner either encouraged or discouraged further investigation. Moreover, neither the Commissioner nor the Delaware Supreme Court even acknowledged Stevens' contention that Reardon failed to hire a private investigator as promised. Nor did the state courts mention Reardon's alleged failure to follow up on the leads provided by Theodorakos. In sum, the state courts seemed quite impressed by Reardon's rather unimpressive response to Stevens' allegations.

█ Further, both the Commissioner and the Delaware Supreme Court implied that the extent of Reardon's investigation was reasonable in light of Stevens' claimed memory lapse. It is certainly true that the degree of investigation that is reasonable depends in large part on the information provided by the defendant. *See Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. But Stevens' asserted lack of memory should have *heightened* Reardon's duty to conduct an independent investigation and to follow up on the leads provided by Theodorakos. Put differently, given Stevens' memory lapse, it would seem *less* reasonable to do no more than follow up on leads that he provided. While this memory lapse certainly made identification of witnesses more difficult, it also made it more necessary.

Finally, the Commissioner seemed satisfied that Reardon had adequately attempted to undermine Auterson's credibility on cross-examination by calling "witnesses who testified that Stevens and the victim were seen dancing together that evening." *See* Comm'r. Rep't. at 9; *Stevens II*, 1995 WL 465149, at \*4. But it appears to be undisputed that only one witness, Cates, testified that she saw them dancing. Further, Cates only testified that she saw them dancing in a group, not one-on-one. This is far short of the allegations contained in the private investigators' interview notes attached to Stevens' motion. Surely, Reardon could not have reasonably concluded that the availability of Cates' testimony obviated the need for further investigation.[20]

---

**20.** Moreover, Cates's testimony was inconsistent with a consensual sex theory. *See* note

■ Given the above concerns, the court convened an evidentiary hearing. The scope of the hearing was limited to the performance prong of the *Strickland* standard. At the hearing, the court hoped to fill in some of the gaps in Reardon's affidavit.[21] Unfortunately, and incredibly, Reardon had virtually no recollection regarding the extent of his pretrial investigation or much else concerning his representation of Stevens. He was also unable to locate his files from this case. Furthermore, he was unable to refute any of the testimony elicited from Stevens and his mother regarding his communications with them prior to trial. Although Reardon could not specifically recall leaving business cards with Theodorakos rather than proactively pursuing the leads she gave him, he acknowledged that this was consistent with his normal practice. Finally, although Reardon could not recall discussing the hiring of a private investigator, he testified that he had never done so in more than 30 years of practice. Given his testimony, it is fair to say that Reardon did nothing to allay the court's concerns. The court therefore concludes that Reardon's affidavit accurately sets forth the full extent of his pretrial search for witnesses.

■ At the end of the day, Reardon did little more than contact people Stevens and his mother identified. Yet, Reardon knew that he could not rely on Stevens to recount the events of the night in question. An attorney's performance is deficient when he or she fails to conduct any investigation into exculpatory evidence and has not provided any explanation for not doing so. *See United States v. Gray*, 878 F.2d 702, 711 (3d Cir.1989) (stating "[i]neffec-

18, *supra*.

21. Respondents contend that Stevens was not entitled to an evidentiary hearing because he failed to meet the requirements of 28 U.S.C. § 2254(e)(2)(A) or (B). *See* Resp. Ans. Br. at 35–38. The court agrees that Stevens did not make the showing required by either of those subparagraphs. The court concludes, however, that he did not need to make such a showing. Those subparagraphs preclude evidentiary hearings only if the petitioner has "failed to develop the factual basis of a claim in State court proceedings." *See* 28 U.S.C. § 2254(e)(2). The Supreme Court has stated that such a "failure" is not established "unless there is a lack of diligence, or some greater fault, attributable to the prisoner or [his] counsel." *See Williams v. Taylor*, 529 U.S. 420, 432–33, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000).

In *Williams*, the Court noted that "[d]iligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *See id.* at 437, 120 S.Ct. 1479. Stevens did not request an evidentiary hearing in state court. The Respondents, however, have not identified any state law or procedural rule that requires such a request. Indeed, the relevant procedure appears to contemplate that the state court makes its own determination as to whether an evidentiary hearing is desirable. *See* Super. Ct.Crim. R. 61(h)(1). Moreover, as noted above, the Commissioner essentially concluded that it was sufficient for Reardon to contact the persons identified by Stevens and his mother. In light of that conclusion, requesting an evidentiary hearing to address Reardon's failure to take *additional* steps would appear to have been futile. Further, Stevens did take steps to attempt to develop a factual record. He hired two private investigators and submitted their interview notes and other materials along with his motion. While it is true that these materials were not authenticated, the state court rules do not appear to limit the form of materials that may be submitted. *See id.* at 61(g)(2); *see also id.* at 61(g)(4) ("The judge *may* require the authentication of any material filed under this subdivision.") (emphasis added).

Finally, while Stevens' pro se status is insufficient to excuse procedural defaults, that status is also not to be disregarded. For these reasons, the court concluded that Stevens did not "fail" to develop the factual basis of his claim within the meaning of 28 U.S.C. § 2254(e)(2), at least with respect to the performance prong of the *Strickland* standard.

tiveness is generally clear in the context of a complete failure to investigate because counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which a such decision could be made") (citing cases); *Sullivan v. Fairman*, 819 F.2d 1382, 1389 (7th Cir. 1987) (stating that complete failure to investigate potentially corroborating witnesses can hardly be considered tactical decision) (quotations and ellipses omitted); *see also* ABA Standards for Crim J. 4–4.1 (3d ed.1993) (citing *Strickland*).[22] Since Stevens was facing a life sentence and consent was, in Reardon's words, "the only defense possible," the court concludes that Reardon's efforts fell short of minimally acceptable professional standards. For the reasons discussed above, the court finds that the state courts' conclusion to the contrary was unreasonable.

### b. Reardon's Failure to Investigate Witnesses Prejudiced Stevens' Defense

 A strong showing of constitutionally deficient performance does not reduce the court's obligation under *Strickland* to independently determine the existence of prejudice. *See Gray*, 878

F.2d at 712. Further, prejudice is inherently more speculative than an objective determination of ineffectiveness.[23] As noted above, Stevens must establish that there is a "reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *See Strickland*, 466 U.S. at 694–95, 104 S.Ct. 2052.

In addressing the *Strickland* prejudice prong, the Delaware Supreme Court discounted the letters and private investigators' notes as "chiefly verbal assaults on the victim's reputation and bring little to bear on the case at issue." *See Stevens III*, 1996 WL 69769, at *2. Similarly, the Commissioner accepted the State's characterization of the information as " 'little more than unverified unsubstantiated attacks on the victim's reputation in the most base way imaginable." ' *See* Comm'r Rep't. at 8 (quoting State's response to Stevens' motion for post-conviction relief); *Stevens II*, 1995 WL 465149, at *4. While Stevens' documentation did contain such attacks, it also included the information described above regarding Auterson's and Stevens' conduct on the night in question. Indeed, in his federal petition, Stevens—no longer acting pro se—is not relying on any of the reputation evidence contained in the letters and private investigators' notes.[24]

---

**22.** The commentary to the ABA Standards states:

> Effective investigation by the lawyer has an important bearing on competent representation at trial, for without adequate investigation the lawyer is not in a position to make the best use of such mechanisms as cross-examination or impeachment of adverse witnesses at trial .... If there were eyewitnesses, the lawyer needs to know conditions at the scene that may have affected their opportunity as well as their capacity for observation. The effectiveness of advocacy is not to be measured solely by what the lawyer does at trial; without careful preparation, the lawyer cannot fulfill the advocate's role. Failure to make adequate pretrial investigation and preparation may

also be grounds for finding ineffective assistance of counsel.

*Id.* at Commentary.

**23.** As one court noted, "[a]ssessments of prejudice are necessarily fact-intensive determinations peculiar to the circumstances of each case." *See Williams v. Washington*, 59 F.3d 673, 684 (7th Cir.1995); *see also Coss v. Lackawanna Cty. Dist. Attorney*, 204 F.3d 453, 463 (3d Cir.2000), *rev'd on other grounds,* 531 U.S. 923, 121 S.Ct. 1567, 149 L.Ed.2d 608 (2001) (stating that courts should evaluate totality of evidence in determining prejudice).

**24.** Because Stevens is not relying on the reputation evidence, the court need not consider whether any such evidence would be admissi-

Concluding that Stevens had failed to satisfy the prejudice prong, the Commissioner noted that the evidence against him was overwhelming. The Commissioner referred to evidence that (1) Stevens' DNA was found in semen and blood on the victim's skirt and vaginal swabbings, (2) blood consistent with Stevens' blood type was found on her skirt in a location consistent with where Auterson claimed to have scratched him, (3) Stevens' wallet was found at the scene and (4) he admitted being at the bar on the evening in question. *See* Comm'r Rep't. at 12; *Stevens II*, 1995 WL 465149, at *6. Minor details aside,[25] the court agrees that there was overwhelming evidence that Stevens had intercourse with Auterson. But of the evidence just mentioned, only the blood is probative of the absence of consent.

Of course, Stevens' "new evidence" by no means establishes his innocence. As previously noted, even if Auterson was drunk, was dancing with and kissing Stevens, and left the bar with him as alleged by the previously undiscovered witnesses, this would in no way diminish her absolute right to say "no." But those circumstances would make it at least somewhat more likely that Auterson may have had consensual sex with Stevens than would be the case if he was a complete stranger. These circumstances—particularly the allegation that Stevens and Auterson left the bar together[26]—would have at least raised a question as to whether Stevens may have been Auterson's "voluntary social companion" (VSC) on the occasion of the offense.[27] *See* 11 Del. C. § 775(a)(2) *see also* 11 Del.

---

ble under any exception to Delaware's "rape shield" law. *See* 11 Del. C. §§ 3508, 3509. The court does not understand the Respondents to contend that the rape shield law would preclude the admission of allegations that Auterson was kissing and dancing with Stevens at Mr. D's on the night of the alleged rape. *See* 11 Del. C. § 3509(b).

**25.** For example, it appears that the DNA evidence introduced at trial related only to semen, not to blood. Further, there was no evidence regarding the probabilities associated with a finding that the blood stains were "consistent with" Stevens' blood type. *See* note 6, *supra*.

**26.** The Commissioner did not even comment on this allegation.

**27.** There are four ways a jury can convict under § 775. *See* 11 Del. C. § 775(a)(1)-(4). According to the trial transcript, the jury convicted Stevens of violating § 775(a)(2). *See* 2/14/91 Tr. at 92–94. To establish a violation, the state had to prove, beyond a reasonable doubt, that (1) Stevens engaged in sexual intercourse with Auterson, (2) he did so intentionally, (3) Auterson did not consent to intercourse, (4) Auterson and Stevens were not VSCs and (5) Auterson had not "permitted" Stevens to engage in intercourse with her in the previous 12 months. *See id.*

At the close of evidence, Reardon initially requested a jury instruction on the lesser included offense of unlawful sexual intercourse in the third degree. *Compare* 11 Del. C. § 773(1), *with* 11 Del. C. § 775(a)(2). When pressed by the Superior Court for the basis for his request, however, Reardon backtracked since he believed the evidence could not demonstrate that Stevens and Auterson were VSCs. *See* 2/14/91 Tr. at 5–6. Indeed, Reardon stated:

I am aware of cases in this jurisdiction that have held a person is not a voluntary social companion, for instance, picking up a hitchhiker and taking them a short distance. There is also a case which I don't know, which said that simply walking up beside a young lady and walking several blocks with her and possibly just walking into a bar with her does not necessarily make one a voluntary social companion.

*See id.* It is evident from this exchange that Reardon's decision to fail to press his request for a lesser included offense was not a strategic decision, but rather the result of his belief that the evidence was insufficient for the jury to believe that Stevens and Auterson were VCSs on the occasion of the offense. *See id.* at 6 ("... in this case there isn't any facts to that [VSC]"). As a result of Reardon's comments, the court denied the request for a lesser included offense. *See id.* at 6–7.

C. § 761(h) (defining VSC). Indeed, the Delaware courts have stated that "being a voluntary social companion reduces confidence in the conclusion of aggression and non-consent." *See State v. Hamilton*, 501 A.2d 778, 780 (Del.Supr.Ct.1985), *aff'd*, 515 A.2d 397 (Table), 1986 WL 17419 (Del. 1986) Further, the allegations about the degree of Auterson's intoxication would call into question her capacity to remember the details of the incident. All of these allegations, being inconsistent with Auterson's testimony, would have called into question her credibility generally.

Moreover, the new evidence may also have helped Stevens develop a more plausible explanation as to why Auterson might have told Lindsay she had been raped. As noted above, Auterson called Lindsay at around 11:30 p.m. and told her she was heading to his house. She did not arrive until several hours later. Auterson also testified that Lindsay's refusal to come pick her up made her angry. Further, both Auterson and Lindsay testified that they had been fighting earlier in the week. Indeed, Auterson testified that she and Lindsay had an "explosive" relationship. Perhaps, in an inebriated state, she decid-ed to have consensual sex with the even more impaired Stevens. Afterwards, and perhaps as her "buzz" wore off, she regretted doing so. When she arrived at Lindsay's house with her clothes in disarray (and missing the tank top she had on when she saw Lindsay earlier that evening), perhaps she claimed she was raped as a means of explaining both her state of disarray and the long delay since her 11:30 p.m. phone call.

Alternatively, perhaps Auterson asked Stevens to walk her home, having been socializing with him earlier and angry with her boyfriend for abandoning her at the bar. At some point Stevens, arguably a VSC of Auterson's at the time, assaults her. Afraid to admit to her boyfriend that her drunkenness or flirtatiousness may have precipitated the incident, perhaps she lies to Lindsay about not being able to recognize her attacker. Indeed, this would at least provide *some* explanation in response to the State's comments during closing argument that, if Auterson was simply trying to frame Stevens, she would have simply identified him.[28]

Although there is not much published case law in Delaware on how much interaction is required to support a determination that the victim and the defendant were VSCs, the new evidence Stevens proffers involves far more interaction than the Delaware Supreme Court has found to be insufficient to support a finding of VSCs. *See, e.g., Folks v. State*, 648 A.2d 424 (Table) No. 301, 1993, 1994 WL 330011, at * 3 (Del. June 28, 1994) (upholding jury's conviction where victim was not voluntary social companion of defendant where incident occurred at victim's grandmother's house, defendant was visiting victim's sister, victim "had no control over" who came to visit her sister and rape occurred while victim's sister briefly left room); *Allen v. State*, 453 A.2d 1166, 1169 (Del.1982) (finding that ten minute conversation between victim and defendant day before rape does not, in and of itself, establish reasonable interpretation of "volun-tary social companion"); *cf. Hammond v. Snyder*, 97–156–GMS, 2000 WL 1239993, at *3 n. 4 (D.Del. Aug.23, 2000) (stating that when dispute arose whether victim and defendant in rape case were voluntary social companions, lesser included offense was "entirely proper"); *Scott v. State*, 521 A.2d 235, 245 (Del.1987) (finding that lesser included charge was improper where evidence demonstrated that defendant and victim had never previously met but that defendant merely persuaded victim "to play the role of a good Samaritan" and take him to look for "jumper cables" to start his car).

28. Once Auterson told both Lindsay and Detective Young (with Lindsay present, and prior to being aware that Stevens' checkbook would be found at the scene) that she could not identify even the race of her assailant, she may have felt "locked in" to that story.

To be absolutely clear, the discussion above is little more than speculation—it is merely a theory that could have been presented to the jury had Reardon identified the witnesses who alleged that Stevens and Auterson were socializing at the bar and left together. By stating possible scenarios, the court does not intend to suggest that these theories are anything but that—theories. But speculation is often the key to determining the existence of "reasonable doubt." Had Reardon hired an investigator or otherwise made an effort to locate witnesses, they could have testified at the trial.[29]

 It is, of course, difficult to predict the effect the allegations would have had on the jury deliberations. But to establish prejudice, it is not necessary to establish that counsel's conduct "more likely than not" altered the outcome in this case. *See Strickland,* 466 U.S. at 693, 104 S.Ct. 2052. Rather, it is only necessary to

establish probability "sufficient to undermine confidence in the outcome." *See id.* at 694, 104 S.Ct. 2052. Notwithstanding the physical evidence noted above, Auterson's credibility was an important aspect of this case. Reardon's failure to investigate witnesses, coupled with Stevens' memory lapse, left Auterson's version of the events in question essentially the only version that was presented to the jury. As such, Reardon's deficient investigation led to a "breakdown in the adversarial process that our system counts on to produce just results."[30] *See Strickland,* 466 U.S. at 696, 104 S.Ct. 2052. It deprived Stevens of virtually any chance of acquittal. And it deprived him of the availability of a jury instruction on the lesser included offense of unlawful sexual intercourse in the third degree.[31] *See* note 27, *supra.*

For these reasons, the court concludes that Reardon's failure to investigate witnesses prejudiced Stevens' defense and

**29.** The affidavits Stevens has submitted with his federal petition, while not presenting new facts beyond those in the private investigators' interview summaries, do indicate that at least some of these witnesses remained available to testify as late as October and November, 1997, when the affidavits were signed.

**30.** Other courts have found the *Strickland* prejudice test satisfied in similar circumstances. *See Coss,* 204 F.3d at 463–64 (finding that counsel's failure to investigate had "pervasive effect" on evidentiary picture at trial and failure to interview witnesses was prejudicial); *Gray,* 878 F.2d at 714 (holding that defendant met prejudice test of *Strickland* where counsel's failure to investigate meant significant evidence corroborating defendant's theory and casting doubt on government's theory was never presented at trial); *see also Brown v. Myers,* 137 F.3d 1154, 1157 (9th Cir.1998) (concluding that failure to investigate meant that testimony of witnesses which would have significantly altered evidence in case was never heard); *Johnson v. Baldwin,* 114 F.3d 835, 839–40 (9th Cir.1997) (finding that counsel's failure to investigate prevented presentation of theories and chal-

lenges to credibility of prosecution witnesses); *Williams v. Washington,* 59 F.3d 673, 682 (7th Cir.1995) (stating, inter alia, that defense counsel's failure to properly investigate case provided defendant "with a significantly different trial than she might have received if represented by a competent attorney").

**31.** Prejudice exists where omitted evidence could reasonably have led to a conviction with a less severe penalty. *See, e.g., Glover v. United States,* 531 U.S. 198, 202–05, 121 S.Ct. 696, 148 L.Ed.2d 604 (2001) (rejecting lower court holding that small differences in sentencing are not sufficient to establish prejudice under *Strickland* and stating "our jurisprudence suggests that any amount of actual jail time has Sixth Amendment significance") (citing cases). A conviction under § 773 would have resulted in a maximum sentence of 30 years, rather than the mandatory life sentence Stevens received upon being convicted of violating § 775(a)(2). *Compare* 11 Del. C. § 4205(b)(1) (sentence for violation of Class A felony was life imprisonment), *with id.* at § 4205(b)(2) (sentence for violation of Class B felony was 3 to 30 years).

that the Delaware state courts' conclusion to the contrary was unreasonable.

### D. Failure to Investigate Lindsay's Work Schedule and Failure to Obtain Medical Records or Expert Testimony

■ Stevens' two other exhausted claims of ineffectiveness lack merit. He first contends that Reardon failed to find and/or use a time card that showed that Lindsay was not at work on March 17, 1990. Although this time card may have had some bearing on Lindsay's credibility, Stevens fails to establish that he suffered prejudice from Reardon's failure to bring this inconsistency to the attention of the jury. Lindsay's testimony was not especially harmful to Stevens. Stevens appears to suggest that if Lindsay was not at work—as he claimed to be—he could have been home planning a false rape charge along with Auterson. This scenario seems inconsistent with Stevens' theory that Auterson lied *to* and not *with* her boyfriend, about the rape. Stevens has not suggested a plausible motivation for Lindsay to falsely accuse him of raping Auterson.[32]

Stevens' final exhausted claim is that Reardon failed to obtain medical records or expert testimony to support his contention that the mark on his scrotum was a herpes sore. This claim lacks merit for the simple reason that even now, several years after his trial, Stevens has still been unable to produce any supporting evidence in this regard. The medical record he submitted, while barely legible, appears to indicate that in 1984 Stevens was diagnosed with some form of herpes in or around his eye. Stevens offers no evidence whatsoever to support his contention that this record is probative of his claim that he had a herpes sore on his scrotum at or around the time the alleged rape occurred.

The "herpes issue" does, however, support the court's conclusion with respect to Reardon's investigation of witnesses. As noted above, Reardon asked Stokes on the witness stand whether she could confirm Stevens' claim that he had a history of herpes. Stokes' response made clear that Reardon had not discussed this matter with her prior to trial. The resulting prejudice was obvious.

### E. Appropriate Remedy

Upon finding a constitutional violation, the court must now consider whether it should stay the issuance of a writ of habeas corpus and/or delay Stevens' release pending any appeal to the Third Circuit. *See Hilton v. Braunskill,* 481 U.S. 770, 775, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987) (holding that courts have broad discretion in conditioning judgment on habeas relief);

---

**32.** Although the court concludes that this claim lacks merit, the Commissioner's analysis of this claim bolsters the court's conclusion that the Commissioner gave undue deference to Reardon's affidavit. In his affidavit, Reardon appears to suggest that he did not use the time card because Lindsay had told Reardon during the course of an interview that he might have been working at a part time job for a friend that day. As such, Reardon was presumably suggesting that the time card from Lindsay's main job was not truly inconsistent with his story. The Commissioner concluded that Reardon's explanation demonstrated a "reasonable trial tactic." *See* Comm'r Rep't. at 13; *Stevens II,* at *6. Regardless of what Lindsay may have said in a pretrial interview, he testified at trial that he was working at his main job that morning, which required him to leave for work at 3:30 a.m. Since there is no stated reason why he could not have used Lindsay's time card against him, Reardon's affidavit does not offer a reasonable trial tactic in this regard. As noted above, however, the court agrees with the Commissioner's conclusion that Stevens failed to establish the necessary prejudice for this claim.

*Henderson v. Frank*, 155 F.3d 159, 168 (3d Cir.1998) (citing *Hilton* ).

 The court will afford the State the opportunity to retry Stevens. This grant of a "conditional writ" is preferable in these types of situations. *See Steinkueh-ler v. Meschner*, 176 F.3d 441, 447 (8th Cir.1999) (finding that district court's order granting the State the option of retrying petitioner or sentencing him to lesser charge was appropriate in case where defense counsel was constitutionally ineffective for failing to use available information to conduct cross-examination of sheriff); *see also Appel v. Horn*, 250 F.3d 203, 218 (3d Cir.2001) (affirming district court's grant of conditional writ of habeas corpus to allow state to conduct proceedings); *Thomas v. Zimmerman*, 583 F.Supp. 701, 708 (E.D.Pa.1984) (stating normal practice once court determines counsel at trial was ineffective is to issue a writ of habeas corpus "with the provision that execution ... be stayed in order to afford the state an opportunity to re-try [sic] the [petitioner]"); *cf. Simmons v. Beyer*, 44 F.3d 1160, 1171 (3d Cir.1995) (stating that usual remedy for jury selection violations is conditional grant which allows state to retry petitioner before properly selected jury) (citing cases).

 Retrying Stevens will not violate the Double Jeopardy clause of the Constitution since (1) it is Stevens—not the State—who will be afforded an opportunity to present additional evidence at trial and (2) Stevens' petition is not based on any serious constitutional violation by the State. *See Coss*, 204 F.3d at 464–67 (describing situations where retrial is constitutionally prohibited upon grant of habeas petition). Since there is no double jeopardy to Stevens—and because retrial would result in increased confidence in the verdict—the court believes the State should have an opportunity to correct the constitutional violations in the original trial.[33]

## IV. CONCLUSION

Judge Irenas has eloquently stated the conflicting impulses a court must wrestle with in deciding to grant judgment in favor a habeas petitioner where there is no showing of actual innocence:

> The Court discharges its constitutional duty with full recognition that the petitioner has been found guilty by a jury of the serious offense charged. While serious criminal conduct should not go unpunished, such a result is mandated, albeit infrequently, to protect the right of all citizens .... Despite the heavy price that the vindication of constitutional liberties occasionally exacts on society, the Court is confident it is one worth paying for because the freedoms guaranteed in the Bill of Rights must be upheld in individual cases in order to be secured for the enjoyment of all.

*Love v. Morton*, 944 F.Supp. 379, 392 (D.N.J.1996). The court echoes this sentiment wholeheartedly, and believes that this case is an exception to the typical habeas petition that comes through its doors.

For the foregoing reasons, the court concludes that Reardon's failure to investi-

---

**33.** The court is aware of its obligations under Federal Rule of Appellate Procedure 23(c) which states that, unless a court orders otherwise, a prisoner must be released pending appeal of a grant of a petition of habeas corpus. *See* Fed. R.App. P. 23(c). Although the court believes it likely that the Respondents will timely file an appeal, they obviously have not had the opportunity to do so. The parties shall submit a letter brief within 10 days from the date of any filing of a notice of appeal. The letter brief shall be no more than five pages and discuss whether the court should release Stevens pursuant to Federal Rule of Appellate Procedure 23(c).

gate potentially favorable defense witnesses denied Stevens the right to constitutionally effective assistance of counsel. Moreover, the court concludes that the state courts' conclusion to the contrary resulted from an unreasonable application of the governing law. The court will issue an appropriate order in conjunction with this opinion.[34]

## APPENDIX

During the pendency of Stevens' habeas corpus petition, by correspondence dated September 22, 2000, he transmitted to the court, and requested that it consider, the opinion of the Delaware Supreme Court in the case of *In the Matter of Reardon*, 759 A.2d 568 (Del.2000) (*"Reardon "*). In *Reardon*, the Delaware Supreme Court disciplined Reardon for failing to exercise "reasonable diligence" in two civil matters. The sanction imposed by the court was (1) a public reprimand, (2) disciplinary probation for a period of two years, and (3) a permanent bar upon Reardon's acceptance of any felony criminal cases and any civil matters, except court appointed guardian cases. *See id.* at 581. Stevens invited the

court to consider whether the ruling supports the arguments he advances in his petition. The court accepted Stevens' invitation, but found that the disciplinary matter was not relevant to its disposition of Stevens' petition.[1]

Nevertheless, because of the significance of the issues that are, in its view, raised by the action of the Delaware Supreme Court to the court system, the legal profession, and, most especially, members of the general public, the court has elected to offer what it hopes will be viewed as constructive comments in the form of this appendix. Although the Delaware Supreme Court is the ultimate arbiter of state criminal law issues, the court believes that federal courts are also constitutionally charged with ensuring and promoting the public's faith in the even-handed administration of justice within its jurisdiction. In keeping with its mandate, the court does not seek to chastise any individual or institution but to encourage a healthy and frank discussion among the various components of the judicial system, members of

---

**34.** The court has also attached an appendix.

**1.** In his transmittal letter, Stevens states that although the Delaware Supreme Court's actions in *Reardon* "[have] nothing to do with" his petition, the opinion is nonetheless pertinent because it speaks to Reardon's professional conduct. In his letter, Stevens argues, "[f]irst the opinion sheds light on Mr. Reardon's performance as an attorney and the [Delaware] Supreme Court's concern over his handling of felony criminal matters. Second, and perhaps more importantly, an issue of candor before your Honor is now raised." Stevens asserts that while on the witness stand during the evidentiary hearing, though Reardon was not asked directly about the disciplinary proceedings pending before the Delaware Supreme Court, he was questioned about his disciplinary record in a manner that should have elicited testimony revealing the existence of that matter.

As to Stevens' first point, the Delaware Supreme Court's opinion in *Reardon* sheds no

light on Reardon's performance in his defense of Stevens, nor even on 'Reardon's general practices in criminal matters. It therefore has no bearing on the court's *Strickland* inquiry. As to Stevens' second point, the court is troubled by Reardon's failure to mention the serious disciplinary proceeding, which was pending at the time of the September 5, 2000 evidentiary hearing, in response to questions about his disciplinary record. (Reardon did acknowledge being sanctioned on several prior occasions, including a one year suspension in the late 1970s, but he could not recall the basis for that suspension.) However, his nearly complete inability to recall anything about his representation of Stevens made his credibility largely irrelevant. And, to the extent that it was relevant to the inquiry surrounding Stevens' petition, the court was already unimpressed with Reardon's credibility prior to Stevens' submission of *Reardon*.

the academic community, members of the general public and other interested parties.

In the course of discussing the sanctions to be imposed, the Delaware Supreme Court stated that "[Reardon] has had a good reputation that includes offering affordable legal services to an under-represented segment of the population that would not otherwise be able to retain the services of a lawyer."[2] *See Reardon,* 759 A.2d at 580. This comment is both troubling and puzzling in light of Reardon's history of disciplinary sanctions,[3] and in light of the Delaware Supreme Court's decision to bar Reardon from accepting any felony criminal cases and nearly all types of civil cases. Indeed, that the Dela-

ware Supreme Court did not explain[4] its reasons for imposing this draconian sanction only adds to the confusion.[5]

Given this lack of clarity, the court—and anyone else reading *Reardon*—can do little more than speculate as to the reasons for the comments regarding Reardon's reputation. Perhaps the Delaware Supreme Court meant that Reardon's reputation was good because he was affordable. Under the circumstances, however, it is difficult to imagine that the Court intended the public to conclude that Reardon enjoyed a good reputation as a competent criminal defense lawyer—particularly in the area of serious felony crime. It is not hard to imagine that one of the reasons the Delaware Supreme Court did not offer a

2. Others have echoed this sentiment. According to an article in the Delaware Law Weekly, the Chief Disciplinary Counsel for the Delaware Supreme Court stated that "[b]ecause of the practice limitations and probation, the public will be sufficiently protected [from Reardon]. We have every reason to believe his continuing practice will provide a benefit to the under-served segment of the population he represents." *See* Celia Cohen, *Reardon, Popular Sussex Attorney Avoids Suspension for Professional Lapses,* Del. L. Wkly, Sept. 30, 2000 at 1. Additionally, according to the final report of the Board of Professional Responsibility (the "Board") regarding Reardon's most recent sanction a former Superior Court judge suggested that "the population he [Reardon] serves" should somehow mitigate the potential sanction. *See* 2/23/99 Report of The Board, at 6 (found at Docket Item # 5 in *Reardon* ).

3. In *Reardon,* the Delaware Supreme Court summarized Reardon's prior history of sanctions beginning in the 1970s and running through 1995. *See id.* at 578–79. In addition to the sanction announced in *Reardon,* Reardon has received (1) a "private" admonition in 1972, (2) a one year suspension in 1977 for mishandling clients' funds, failing to file income tax returns, and failing to pursue cases with diligence and competence, and (3) a

public reprimand and two years of probation in 1995 for failing to pay personal income taxes and filing a "false registration" with the Delaware Supreme Court. *See id.*

4. As the court pondered the silence of the Delaware Supreme Court, it was reminded of a memoir of the famous sleuth, Sherlock Holmes. While explaining to the typically amazed Dr. Watson and his enraptured audience how he solved the case of the unexplained disappearance of the famous race horse, Silver Blaze, and the apparent murder of its trainer, Holmes noted that the perpetrator must have been known to the horse. He explained that ". . . I had grasped the significance of the silence of the dog, for one true inference invariably suggests others." *See* Sir Arthur Conan Doyle, Silver Blaze, in The Complete Sherlock Holmes 349 (Doubleday 1930). As in the case of Silver Blaze, the Delaware Supreme Court's silence is significant. Unfortunately, however, its significance is difficult to grasp.

5. The rationale for the permanent bar on felony criminal cases is especially perplexing since the disciplinary proceedings involved two civil cases and the Delaware Supreme Court rejected the conclusion of the Board that the two cases demonstrated a "pattern of neglect." *See Reardon,* 759 A.2d at 576.

rationale for its choice of sanction might have arisen out of a reasonable concern that a full explication might open the floodgates for collateral attacks on convictions by those defendants represented by Reardon in his over 30 years of what was principally a criminal practice.[6] *See Reardon* 759 A.2d at 572 n. 4. Certainly, the implications for an already overburdened system may well be significant.[7]

The court questions, however, whether the public would have ultimately been better served by an explanation for the Delaware Supreme Court's action. Whatever outcry would have occurred as a result of any subsequent successful collateral attacks would have been muted by the increase in public confidence that would have resulted from the willingness of the Delaware Supreme Court to disclose and correct an apparent failure by the state judicial system. Although some may differ,[8]

the court believes that permitting Reardon to maintain a criminal practice for so long a time—in spite of the public's apparent need for protection from an evidently incompetent attorney—can only undermine the faith and confidence of the public in the judicial system as a whole.

Perhaps the import of the court's comments is best understood by describing the opposite situation. Imagine that the Delaware Supreme Court had "opened the floodgates" and, by its comments, encouraged challenges to convictions by Reardon's prior clients. At the very least, the Court's willingness to disclose and correct a systemic failure might have helped to allay the perception that justice is not even-handed for all population groups in the state judicial system. The Delaware Supreme Court is already aware of this problem. Indeed, it has issued a statement about it[9] and commissioned a task

6. Another possible reason for the Delaware Supreme Court's lack of explanation is that Reardon was apparently willing to accept a substantial restriction on his criminal practice (although perhaps not quite as substantial as the one ultimately imposed by the Delaware Supreme Court). *Compare* 2/23/99 Report of The Board, at 5 (stating that Reardon "agreed to decline serious criminal felony cases or where death was involved"), *with Reardon*, 759 A.2d at 581 (imposing permanent bar on Reardon's acceptance of any felony criminal case). Reardon's willingness to accept such a restriction, however, was not clear from the Delaware Supreme Court's opinion. As such, anyone reading *Reardon* is left to wonder what led to such a drastic sanction. One can only imagine the confusion and suspicion that someone such as Stevens—who is presently serving a life sentence after being represented by Reardon—must have felt when reading the Delaware Supreme Court's opinion.

7. For example, had the Delaware Supreme Court disclosed Reardon's statement at the hearing before the Board that he "hardly ever needs to do research since he believes that his skills are as a spokesman," one could imagine that many of Reardon's former clients might

decide to seek a reexamination of their convictions. *See* 2/23/99 Report of The Board, at 4–5.

8. *See* note 2, *supra*.

9. On April 5, 1995, the Delaware Supreme Court issued Administrative Directive Number 101 which states that:

It is important that the Judicial Branch of government in Delaware address the issue of bias and invidious discrimination with respect to age, color, gender, race religion, sexual orientation, or socioeconomic status ... in the justice system. Judges, lawyers, and court personnel should be sensitive to the recognition of any such bias, or the appearance thereof, and should take reasonable steps to correct the same ... It is important that the Judicial Branch of the government of Delaware should also study the issue of fairness with respect to race and ethnicity as it pertains to that branch, including the responsibility for admissions to the Bar and regulation of the members of the Bar.

Del. S.Ct. Admin. Dir. No. 101, at 1–2 (quoting Del. S.Ct. Admin. Dir. No. 90).

586

force to look into the matter further.[10]

Certainly, society should not—and must

10. On October 1, 1996, after over a year of work, the Delaware Supreme Court's Task Force On Racial And Ethnic Fairness issued its report. *See* Report, Delaware Supreme Court Task Force on Racial and Ethnic Fairness, Oct. 1, 1996 (the "Report").

The Report concluded that extensive data collected by the task force either did not support a finding of actual unfair disparate treatment of any demographic group in any particular phase or area of the justice delivery system, or that the data was insufficient to support accurate conclusions. The Report does, however, publish the results of a public opinion survey commissioned by the task force. In the main, the results are reported as ten separate findings related to *perceptions* of the treatment of certain population groups. *See id.* at xli-xliii. Eight of the findings discuss differences in perception between whites and "minorities" concerning the public's confidence in the Delaware court system generally, the need for improvement in that system, and the need for the public to have more information about the court system in Delaware. Findings 5 and 10 demonstrate that, regardless of race or ethnicity, respondents to the survey believed that improvement was needed in the areas of speed of justice, ensuring fair treatment of all racial and ethnic groups, reducing the cost of using the courts, providing adequate facilities, convenience of those facilities, dissemination of information to the public about the courts, attitude of court employees and intelligibility of court related documents. In general, finding number 6 summarizes the other findings as they relate to perceptions about the treatment of whites and "minorities." This finding states that "[m]inority public opinion respondents were more likely than white public opinion respondents to say that a number [of] people were not treated fairly by the Delaware court system. This was particularly true of beliefs concerning the treatment of minorities and lower income persons." *See id.* at xlii.

In *Reardon,* the Delaware Supreme Court did not specifically identify what segment of the population it viewed as "under-represented." Moreover, from the standpoint of demography, the language of the opinion gives no indication that the court had any particular portion of the population in mind. Nevertheless, the fact that so-called minority population groups frequently find themselves placed in the "under-represented" or "under-served" category is well beyond dispute. Additionally, the court notes several demographic facts from which certain inferences might reasonably be drawn. For example, the most recent census reveals the following break-out of self-identified population groups in Delaware: Whites 74.6%, Black or African–American 19.2%, Hispanic or Latino (of any race) 4.8%, Asian 2.1%, American Indian or Alaska Native 0.3%, Some other race 2% and Two or more races 1.7%. *See* U.S. Census Bureau, Census 2000 Redistricting Data (Public Law 94–171) Summary File, Matrices PL1, PL2, PL3, and PL4, *available at* http://factfinder.census.gov.

Given these statistics, it might be reasonable to surmise that if the Delaware Supreme Court had provided its definition of the term "under-represented," it might have included African–Americans, Hispanics, other people of color, and lower income persons. However, regardless of the Delaware Supreme Court's definition, if one accepts the premise stated above in this note that "minorities and lower income persons" perceive they are not treated fairly by the Delaware court system, and add to that the population statistics noted above (which do not account for those who might fit some definition of "under-represented" or "under-served"), it might be reasonable to conclude that a significant segment of Delaware's population harbors the perception that it is not treated fairly by the Delaware court system. Further, given Reardon's history at the bar, the ruling of the Delaware Supreme Court in *Reardon,* statements made by the court and others during the course of the ruling and thereafter, it seems reasonable to ask whether the perception is one that enjoys a basis in fact.

The court wishes to note that it does not intend its comments in this footnote to be perceived as implicit criticism of public defender services here in Delaware. It would appear that Delaware has a robust system for providing legal services to indigents who are charged with the commission of crimes in both the state and federal court systems. Moreover, it should be noted that not all of the concerns discussed in this footnote were implicated in Reardon's representation of Stevens. Stevens is white and Reardon was not court appointed. At the evidentiary hearing, however, it became apparent that Stevens is

not—tolerate a system where the quality of justice delivered to discreet groups (racial, ethnic, economic, or any other identifiable population group) is materially inferior to that received by others. Nor should we be willing to endure a justice system where this is perceived to be true. State judicial systems and the federal judicial system must avoid the head in the sand approach of not forthrightly acknowledging the detection of faults which might lead to a full blown eruption in our collective system of justice.[11] The Sixth Amendment right to counsel is more than just a right to have a warm body seated next to an accused during a criminal proceeding. Indeed, "[i]t has long been recognized that the right to counsel is the right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); *see generally Strickland*, 466 U.S. at 686, 104 S.Ct. 2052

(stating that counsel is ineffective by "simply ... failing to render adequate legal assistance") (internal quotations and citations omitted).

In *Strickland*, the Supreme Court chose not to define "effective assistance" by enumerating a specific list of "do's" and "don't's" for attorneys in criminal matters. *See Strickland*, 466 U.S. at 706–09, 104 S.Ct. 2052 (Marshall, J. dissenting) (complaining that majority's test is too "malleable" since it requires judges to "use their own intuitions" about what constitutes "professional representation"). Rather, the Sixth Amendment requirement is merely stated in terms of an objective standard of reasonableness. *See Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. For better or worse, it is not the duty of the courts to police attorneys. As the Court stated:

of modest means and that this may have limited the representation that he received.

11. Others have allowed reexaminations of various aspects of the criminal justice system with an eye toward overcoming potential problems. In Los Angeles, the District Attorney has devoted significant resources to an investigation of allegations of false testimony by police officers which may result in the overturning of a substantial number of convictions. *See* Todd S. Purdum, *Los Angeles Police Scandal May Soil Hundreds of Cases*, N.Y. Times, Dec. 16, 1999, at A16. Oklahoma Governor Frank Keating recently ordered a reexamination of all felony cases—including capital cases—which involved a certain Oklahoma police laboratory scientist who has been accused of giving improper courtroom testimony or misidentifying evidence. *See* Jim Yardley, *Inquiry Focuses on Scientist Employed by Prosecutors*, N.Y. Times, May 1, 2001, at A14. As a result of the initial investigation, the Oklahoma Attorney General's Office will closely scrutinize three death penalty convictions where the police scientist analyzed evidence or testified at trial. *See Oklahoma Will Study Capital Cases*, N.Y. Times,

July 18, 2001, at A14. Illinois Governor George Ryan has ordered a moratorium on all executions while a panel reviews the state's death penalty procedures. In ordering the halt, Governor Ryan cited the high number of reversals of death sentences in the state courts. *See* Dirk Johnson, *Illinois Citing Faulty Verdicts, Bars Executions*, N.Y. Times, Jan. 31, 2001, at A1. In a recent address to the Minnesota Women Lawyers Association, Justice Sandra Day O'Connor stated that since defendants with more money get better legal defense, "perhaps it's time to look at minimum standards for appointed counsel in death cases and adequate compensation for appointed counsel where they are used." *See O'Connor Questions Death Penalty*, N.Y. Times, July 3, 2001, at A9.

Although these examples raise extremely different—and much more serious—concerns than the one implicated by Reardon's representation, the point is the same. Correcting deficiencies in the judicial system may cause short term pain, anger, and confusion in these communities, but the court believes that the ultimate result will be a stronger judicial system.

The Sixth Amendment refers simply to 'counsel,' not specifying particular requirements of effective assistance. It relies instead on the legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process that the Amendment envisions.

*Id.*

Thus, the Court has quite clearly charged the legal profession with the responsibility of regulating itself. It would seem, therefore, that the legal profession in any given jurisdiction must do more than just keep a set of minimum standards for its practitioners on its books. In other words, it seems reasonable to conclude that when the Court speaks of the "maintenance of standards," it intends that the profession ensure that each of its constituent parts, particularly counsel, is, in fact, functioning properly. For example, when the system recognizes that an attorney is consistently providing constitutionally substandard representation which results in injury to his or her clients, it is the responsibility of the legal profession to act to protect the public.

Although somewhat late for Stevens, the Delaware Supreme Court's opinion in *Reardon* seems to reflect such recognition in the instance of Reardon. There is little doubt, however, that Stevens and the general public will be among those who question the fairness and candor of a judicial system that would permit a condition like this to persist for a prolonged period, and then seem to attempt to make it go away quietly.

Some might argue that the situation illustrated by this case does not suggest a systemic breakdown. To some, it may appear that this instance is merely an excusable oversight by the legal profession to address the individual peccadillos of one practitioner, and that, after all, he was providing a benefit to the "under-served segment of the population he represents." [12] *See* note 2, *supra.* As has already been stated in this appendix, the court believes that arguments and statements like these by key actors in the Delaware legal profession and state criminal justice system might, at the very least, create a perception that runs the very real risk of undermining the public's confidence in the fairness of the system. *See* note 10, *supra.* At worst, failings like Reardon's—and the culture which allows them to go unchecked—might be evidence that there has been an actual failure to maintain sufficient standards in Delaware such that there has been a breakdown in the adversary process in its courts. It is no excuse that this failure may be limited to an "under-served segment of the population." Justice denied to one person—no matter his or her station in life—is justice denied to all people.

The court hopes that its comments aid in the strengthening rather than weakening of the judicial system in this state. It is not the court's intention to undermine the finality and certainty of each and every felony case in which Reardon was involved. Indeed, based on the limited record before it—and mindful of its duty not to render advisory opinions—it would be unreasonable to conclude that Reardon was constitutionally ineffective in any or all of his

---

12. It could be argued that bad representation is better than no representation at all. *See, e.g.,* notes 2 & 7, *supra.* While that may be true, the solution to the problem of the "under-served segments" of the population cannot be to offer them representation deemed not to be competent. Rather, it would seem more reasonable to expect an egalitarian society to expand the quantity and quality of available resources.

other felony representations. Instead, the preceding comments are offered to further stimulate the kind of continued introspective analysis in which the courts and the legal profession must continually engage on the subject of the quality of legal services available to all citizens—including those, like Stevens, who may not be poor enough to qualify for the services of a public defender but do not have the financial resources to hire a quality attorney.