

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-2-2002

# Stevens v. DE Corr Ctr

Precedential or Non-Precedential: Precedential

Docket No. 01-3315

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Stevens v. DE Corr Ctr" (2002). *2002 Decisions.* Paper 368.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/368

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed July 2, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-3315

DARRELL W. STEVENS

v.

DELAWARE CORRECTIONAL CENTER;
ATTORNEY GENERAL OF THE STATE OF DELAWARE,
Appellants

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civil No. 97-cv-00130)
District Judge: Hon. Gregory M. Sleet

Argued: April 5, 2002

Before: SLOVITER, BARRY and ALARCON,*
Circuit Judges

(Filed: July 2, 2002)

Thomas E. Brown (Argued)
Department of Justice
Wilmington, DE 19801

 Attorney for Appellants

_____

* Honorable Arthur L. Alarcon, United States Circuit Judge for the Ninth
Circuit, sitting by designation.

Charles M. Oberly, III
Karen V. Sullivan (Argued)
Oberly, Jennings & Rhodunda, P.A.
Wilmington, DE 19899

 Attorneys for Appellee

OPINION OF THE COURT

SLOVITER, Circuit Judge.

The State of Delaware appeals from the order of the
District Court for the District of Delaware conditionally
granting the petition of Darrell Stevens for a writ of habeas
corpus. See Stevens v. Del. Corr. Ctr., 152 F. Supp. 2d 561
(D. Del. 2001). The State raises two arguments on appeal:
(1) that the ineffective assistance claim upon which the
District Court granted federal habeas relief was
unexhausted and is thus procedurally barred, and (2) in
the alternative, that the state courts' application of

Strickland v. Washington, 466 U.S. 668 (1984), was not objectively unreasonable under 28 U.S.C. S 2254(d) (2001).

I.

FACTS AND PROCEDURAL BACKGROUND

A. Facts1

On March 16, 1990 at about 4 p.m., Tracey Auterson went with some friends to a bar called Mr. D's Pizza & Restaurant. Sometime that evening, Marvin Lindsay, Auterson's boyfriend, with whom she had been living until earlier that week, arrived at Mr. D's. The two quarreled, after which Lindsay left the bar. At approximately 11:30 p.m., Auterson called Lindsay at his home and asked if she could stay with him that night, rather than return to her parents' home where she had been staying. He said she

_____

1. Some of the facts, the procedural history, and the arguments of the parties below appear in the District Court's opinion, Stevens v. Del. Corr. Ctr., 152 F. Supp. 2d 561 (D. Del. 2001).

2

could stay with him but he declined her request to come pick her up at the bar.

According to Auterson's testimony, after the phone call she started to walk to Lindsay's home, about a fifteen-minute walk from Mr. D's. On the way, she was grabbed from behind, dragged into an apple orchard, and forcibly raped. During the struggle, she scraped her attacker's genitals with her fingernails. Later she fainted. When she regained consciousness, the assailant was still with her, but he subsequently fled. Auterson was unable to identify her attacker because she was lying on her stomach part of the time and was told to keep her eyes closed when she was later rolled over onto her back.

After the assailant fled, Auterson ran out of the orchard and shortly thereafter, at approximately 2:20 a.m., she went to Lindsay's home and told him that she had been raped. Lindsay noted that Auterson's clothes were in disarray and that she was upset. Lindsay testified, however, that at the time he was not sure whether he believed her story. Lindsay spent about a half hour to calm Auterson down, after which they both went to sleep.

Lindsay left for work at about 3:30 a.m. After discussing the incident with his co-workers, Lindsay called Auterson at approximately 8:00 a.m. to tell her she should report the rape to the police and that if she did not call the police she should go to her mother's home. According to Auterson, at about 9:00 a.m., she returned to the scene of the rape because she needed a cigarette and believed she lost her cigarettes in the orchard. While there, she found the tank top that she had been wearing the previous evening. She

then became frightened and returned to Lindsay's home.

After Lindsay returned from work at about 2:00 p.m., Auterson called the police. Detective Young interviewed Auterson that afternoon at Lindsay's home and in Lindsay's presence. Young and Auterson then returned to the orchard where, in an area of the orchard where the ground appeared compressed, they found her underpants and a wallet belonging to Stevens.

Thereafter, Detective Young and Auterson went to the hospital for a physical examination. Semen was removed

from Auterson's vagina and blood and semen were found on her skirt. DNA testing revealed that both semen samples matched Stevens' DNA and the blood was consistent with Stevens' blood type (and not Auterson's). Young and Auterson then went to the police station where Detective Young reinterviewed Auterson, this time on audiotape. Auterson was unable to give Detective Young a physical description of her assailant.

Auterson testified that she had never seen Stevens before, had never been on a date or otherwise socialized with him, and had not danced with him on the night in question:

> Q: Have you ever seen [the defendant] before?
>
> A: No.
>
> Q: Okay. Did you ever socialize with that man before that you recall today?
>
> A: I don't recognize him, no.
>
> Q: Did you ever go out with him, date him? Did you ever have any sexual relations with him ever in your life?
>
> A: No.
>
> . . . .
>
> Q: Would you be able today to identify him as the person who was with you in the orchard that night?
>
> A: To tell you the truth, no.

App. at 49-50.

Auterson also testified that, although she had been at Mr. D's for more than seven hours, she only consumed about one and a half glasses of beer. She did acknowledge that, when she left the bar, she was "buzzed" but not "seriously impaired." Stevens, 152 F. Supp. 2d at 567.

Stevens was arrested on March 19, 1990. He admits that he was also at Mr. D's on March 16, 1990. According to Stevens, he got very drunk, having consumed approximately four pitchers of beer and one or two shots of alcohol that evening. Stevens was able to recall many

details of his actions in the bar that evening such as ordering a tuna sub but only eating half of it, App. at 44, and ordering four pitchers of beer, App. at 45, but he was unable to remember anything after leaving the bar. He did testify that he was "fairly certain" that he left the bar alone, App. at 46, and that his next memory was waking up the following morning in a driveway behind the bar without his wallet. App. at 46-47. He further testified that he did not know Auterson, although he may have seen her at Mr. D's on March 16:

> Q: The young lady who testified here . . . Tracey Auterson, do you know her?
>
> A: No, sir, I don't.
>
> Q: You don't recall --
>
> A: I might have seen her at the bar.
>
> Q: But you don't have any specific memory of that?
>
> A: No, sir; I don't know her personally.

App. at 48a.

After Stevens' arrest, the police examined him and found a scrape, sore, or abrasion of some sort on his scrotum. A photograph of this mark was shown to the jury.

Stevens was charged with first-degree unlawful sexual intercourse and second-degree sexual penetration. Under Delaware law at the time of Stevens' trial, a person could be convicted of first-degree unlawful sexual intercourse if the following elements were present: (1) intentional sexual intercourse with another person (2) without the other person's consent, (3) when the other person was not a voluntary social companion on the occasion of the particular sexual intercourse in question and (4) when the other person had not consented to sexual intercourse with the person in question for the previous twelve months. Del. Code Ann. tit. 11, S 775(a)(2) (repealed 1998).2 Under then-existing Delaware law, if the prosecution failed to establish

---

2. The crime of rape in the first degree is now codified in Del. Code Ann. tit. 11, S 773 (2001) and no longer refers to whether the victim and the defendant were voluntary social companions.

that the defendant and the victim were not voluntary social companions, the crime of first-degree unlawful sexual intercourse was reduced to third-degree unlawful sexual intercourse. Del. Code Ann. tit. 11, S 773 (repealed 1998).

## B. Stevens' Trial

To defend Stevens, his mother, Peggy Lane, hired Dennis Reardon. Because Stevens has no memory of what he did after leaving Mr. D's, he could not affirmatively deny engaging in sexual intercourse with Auterson. Instead, Reardon's trial strategy was to argue that Stevens did not have sexual intercourse with Auterson, but, in the alternative, to argue that if he had sex with her, it was consensual. In support of the latter, Stevens testified that he does not get violent when he is drunk. That testimony was corroborated by the testimony of Maureen Stokes, a former girlfriend of Stevens. Reardon suggested to the jury that Auterson must have lied to Lindsay about being raped in order to cover up having consensual sex with Stevens.

Reardon also tried to elicit from Stokes a confirmation of Stevens' explanation of the mark on his genitalia. At trial, the prosecution argued that this mark corroborated Auterson's claim that she scraped her attacker's genitalia. According to the prosecution, her claim was further corroborated by the blood found on her skirt. In the prosecution's view, the mark on Stevens' genitalia undermined the defense's consensual sex theory. Stevens testified that he had a "history" of herpes and that the mark on his scrotum was a herpes sore, not a scratch. Reardon attempted to corroborate Stevens' history of herpes by testimony from Stokes. Reardon had apparently failed to discuss with Stokes his intention to question her on this subject, because Stokes testified that she was unaware that Stevens ever had herpes. Despite the prosecution's emphasis of this point on cross-examination of Stokes, Reardon continued to press the issue on redirect. Stokes again denied ever knowing that Stevens had herpes, despite having been in a close and intimate relationship with him for about a year.

Reardon also called two witnesses who were present at Mr. D's on the evening of the rape. Kathy Theodorakos, the

6

owner of Mr. D's, testified that before she left the bar that evening, between 9:00 and 9:30 p.m., she saw Stevens and he was not drunk. Karen Cates, a friend of Stevens, testified that she saw him dancing that evening with a group of people that included Auterson but she did not see him dancing with Auterson one-on-one. She also testified that when she saw Stevens dancing at approximately 10:00 p.m., he appeared to be drunk or "high" but was not falling down or stumbling. Cates also testified that when she was driving home at about 11:00 p.m., she saw Stevens walking by himself in a direction toward his home, which was in a

different direction than the apple orchard.

Stevens was convicted of first-degree unlawful sexual intercourse[3] by a jury in Delaware Superior Court in February 1991 and he was thereafter sentenced to life imprisonment without the possibility of parole or the reduction of his sentence for twenty years. In June 1992, Stevens' conviction and sentence were affirmed by the Delaware Supreme Court on appeal. Stevens v. State, 610 A.2d 727 (Del. 1992).

C. Post-Conviction Proceedings

According to Lane, Stevens' mother, it was her understanding when she hired Reardon to represent her son that Reardon was going to hire a private investigator to attempt to locate potentially favorable witnesses because Stevens had little recollection of the night of the alleged rape due to his heavy drinking and his subsequent memory lapse. In particular, since Stevens could provide almost no information to assist Reardon in finding people who were at Mr. D's on the night of the alleged rape, Lane agreed to pay the investigator's fees. Reardon did not, however, hire an investigator. Stevens maintains that until the first day of the trial he and his mother were unaware of Reardon's failure to hire an investigator.

According to a statement by Lane submitted in support of

_____

3. The jury found Stevens not guilty on the two counts of second-degree sexual penetration, counts that were based on the allegation that Stevens had inserted his fingers into Auterson's vagina and anus prior to intercourse.

Stevens' motion for post-conviction relief, Kathy Theodorakos, the owner of Mr. D's, told her that Reardon met with Theodorakos at Mr. D's prior to trial and that she gave him the names of additional people he should contact. Supp. App at 47. Reardon, however, merely left his business cards with Theodorakos and asked her to pass them out and have people call him. Reardon also apparently contacted approximately ten possible witnesses suggested by Stevens or Lane.

After Stevens was convicted, Lane hired two private investigators to try to identify individuals with information relevant to her son's case. On October 17, 1994, Stevens filed a motion for post-conviction relief in Delaware Superior Court in which he raised an ineffective assistance of counsel claim alleging, inter alia, Reardon's failure to conduct an adequate investigation. Stevens identified various potential witnesses, attached the investigators' summaries of interviews with the witnesses they had located, and submitted letters from three potential witnesses. Some of the letters and interview notes included attacks on Auterson, attributing to her a reputation for

promiscuity and for liking violent sex, and some contained information from people claiming to have been present at Mr. D's on the night in question and to have seen Stevens and Auterson dancing and socializing together at the bar. For example, Jan and Randy Miller both claimed that they saw Stevens and Auterson dancing and drinking together, that Auterson appeared to be drunk and was kissing Stevens, and that Stevens and Auterson left the bar together.

The Superior Court ordered Reardon to file a response to Stevens' ineffective assistance of counsel claims. Reardon submitted an affidavit stating that because of the degree of Stevens' intoxication and his memory lapse, Stevens" 'was unable to give me anything to work on as far as forming a defense.' " Stevens, 152 F. Supp. 2d at 572 (quoting Appellant's Appendix at 11, Stevens v. State, 676 A.2d 907 (Del. 1996) (No. 95-323)). Reardon stated that after reviewing the evidence and talking to witnesses, he decided that " 'the only defense possible was to attempt to persuade the jury that [Auterson] consented to sex with Mr. Stevens,

then she attempted to cover herself by telling her boyfriend she was raped.' " Id. at 572-73 (alternations in original) (quoting Appellant's Appendix at 11, Stevens (No. 95-323)).

Reardon identified ten names of possible witnesses that Stevens and his mother had provided and attested that " 'all of the above were contacted by me either personally or by phone prior to trial.' " Id. at 573 (quoting Appellants' Appendix at 12, Stevens (No. 95-323)). His affidavit does not describe the extent of the "contacts" or the information he obtained from them. Of the ten names given to him by Stevens and his mother, Reardon apparently issued subpoenas to five of them, and four testified at trial. Only two -- Theodorakos and Cates -- testified as to the events at Mr. D's on the night in question. Reardon's affidavit did not deny Lane's claim that Reardon simply left business cards with Theodorakos, rather than following up himself with the names she provided to him. Stevens filed a response to Reardon's affidavit in which Stevens noted Reardon's failure to hire a private investigator as promised and Reardon's failure to pursue the leads given to him by Theodorakos.

The Superior Court referred the matter to a Commissioner who concluded that Stevens had not established either of the two prongs necessary to prevail on an ineffective assistance of counsel claim under Strickland. The Superior Court issued an order adopting the recommendations of the Commissioner. State v. Stevens, No. IK90-03-0476-R1, 1995 WL 465149, at *1 (Del. Super. Ct. July 18, 1995) (appending Commissioner's report). Stevens appealed the denial of his motion to the Delaware Supreme Court. The Delaware Supreme Court affirmed the denial of post-conviction relief. Stevens v. State, 676 A.2d 907 (Del. 1996).

In March 1997, Stevens filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. S 2254. Stevens claimed he was denied the effective assistance of counsel, contending that Reardon was deficient in several ways relating to the investigation (or lack thereof) and the preparation of the case before trial. In the appendix accompanying his opening brief in the habeas proceeding, Stevens presented for the first time in any court affidavits

(unsigned) from various witnesses in support of his ineffective assistance of counsel claim. Supp. App. at 17-24. Three weeks later, Stevens submitted revised copies of the affidavits signed by the affiants.

The District Court convened an evidentiary hearing limited to addressing the reasonableness of Reardon's performance on behalf of Stevens. The District Court described Reardon's testimony at the hearing by saying "[u]nfortunately, and incredibly, Reardon had virtually no recollection regarding the extent of his pretrial investigation or much else concerning his representation of Stevens." Stevens, 152 F. Supp. 2d at 576. Reardon could not locate any of his files related to Stevens' case and was unable to refute any of the testimony by Stevens and his mother concerning representations he had made to them prior to trial. He did not recall failing to pursue all the leads Theodorakos gave him but did testify that it fit his normal practice to have left his business cards with her and asking her to have witnesses call him long distance. Finally, although Reardon could not recall discussing the hiring of a private investigator with Stevens' mother, he admitted that he had never hired an investigator in more than thirty years of practice. Id.

On July 23, 2001, the District Court conditionally granted Stevens' habeas petition based on the ineffectiveness claim. Stevens, 152 F. Supp. 2d at 565. The State of Delaware appeals, arguing first, that Steven's ineffective assistance claim is procedurally barred because he had not exhausted his state remedies, and second, that the state courts' application of Strickland was neither objectively unreasonable nor prejudicial.

II.

JURISDICTION AND STANDARD OF REVIEW

We review de novo a "district court's determination of whether an issue has been exhausted." Whitney v. Horn, 280 F.3d 240, 249 (3d Cir. 2002). This court also conducts a plenary review of a district court's legal conclusion but

reviews its factual conclusions using the clearly erroneous

standard. Id.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) altered the standard of review that a federal habeas court must apply to a state prisoner's claim that was adjudicated on the merits in state court. See Williams v. Taylor, 529 U.S. 362, 402-13 (2000) (interpreting 28 U.S.C. S 2254(d)(1)); see also Dunn v. Colleran, 247 F.3d 450, 457 (3d Cir. 2001) (explaining Williams). Under AEDPA, in conducting a habeas analysis a federal court must presume that the factual findings of both state trial and appellate courts are correct, a presumption that can only be overcome on the basis of clear and convincing evidence to the contrary. 28 U.S.C. S 2254(e)(1); Duncan v. Morgan, 256 F.3d 189, 196 (3d Cir.), cert. denied, 122 S. Ct. 269 (2001). A federal court may not issue a writ of habeas corpus unless the state court adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. S 2254(d)(1).

The Supreme Court in Williams interpreted the "contrary to" clause of this provision as follows: "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. Additionally, the Williams Court interpreted the "unreasonable application" clause as allowing "a federal habeas court [to] grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. The Court further explained that under the "unreasonable application" clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

11

The "clearly established federal law" applicable to Stevens' claims of ineffective assistance of counsel is the familiar two-pronged test the Court articulated in Strickland v. Washington, 466 U.S. 668 (1984). Under Strickland, Stevens must first establish that Reardon's performance was constitutionally deficient by showing that his representation "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. Second, Stevens must show that there is a "reasonable probability" that Reardon's deficient performance prejudiced his defense to the extent that counsel's mistakes and/or omissions may well have affected the outcome of the case against him. Id. at 694. The Supreme Court recently reconfirmed that counsel's failure to conduct an adequate investigation must be scrutinized under the Strickland test. See Bell v. Cone,

122 S. Ct. 1843, 1852 (2002) (subjecting counsel's failure to adduce mitigating evidence to the performance and prejudice components of Strickland).

III.

DISCUSSION

A. Exhaustion

Before a federal court can consider granting a petition for a writ of habeas corpus to a person incarcerated pursuant to a state court judgment, the petitioner must first exhaust any available state court remedies. 28 U.S.C. S 2254(b)(1); Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1997). To satisfy the exhaustion requirement, the petitioner must "fairly present" all federal claims to the highest state court before bringing them in federal court. Whitney v. Horn, 280 F.3d 240, 250 (3d Cir. 2002). State remedies are not deemed exhausted if the petitioner "has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. S 2254(c).

A failure to exhaust will be "excused" when the habeas petitioner's claims are procedurally barred under state rules. Whitney, 280 F.3d at 250 (citing Gray v. Netherland, 518 U.S. 152, 161 (1996)); see also 28 U.S.C. S 2254(b)(1)(B)(i). Under such circumstances, federal courts

12

may not consider the merits of such claims unless the petitioner can establish "cause and prejudice" or a "fundamental miscarriage of justice" to excuse the procedural default. See Whitney, 280 F.3d at 252-53; McCandless v. Vaughn, 172 F.3d 255, 260 (3d Cir. 1999) (citing Coleman v. Thompson, 501 U.S. 722, 750 (1991)).

Here, the State argues that Stevens has failed to exhaust his state remedies because the ineffective assistance of counsel argument he made in the District Court was stronger than the one he made in the state post-conviction courts, and therefore Stevens' federal claim is procedurally barred. Specifically, Stevens submitted to the Superior Court that heard his collateral case copies of letters and investigator notes that he or his mother had apparently solicited after his trial. Stevens claimed the persons who wrote the letters or who had been interviewed should have been called for trial to provide impeachment testimony against Auterson and to testify that Stevens and Auterson had danced together and left the bar together. The State argues that the letters offered to the Superior Court differ from the affidavits offered to the District Court. In fact, the Superior Court said it viewed Stevens' unverified allegations with grave suspicion.

Stevens responds that the affidavits presented no new facts but rather merely recite facts already submitted to the state courts. The District Court agreed, as do we. The

affidavits presented in the District Court do "not fundamentally alter the legal claim already considered by the state courts." Vasquez v. Hillery, 474 U.S. 254, 260 (1986). For this reason, Stevens' submission of the affidavits does not render his claims unexhausted. We therefore turn to the substantive claims of Stevens' habeas petition.

B. Ineffective Assistance of Counsel

Stevens claims that Reardon's performance as his counsel was constitutionally deficient because he made an inadequate effort to identify favorable witnesses and failed to hire a private investigator. The District Court concluded that because the purpose of hiring a private investigator would have been to assist with the identification of

13

favorable witnesses, these two claims merge into the single claim that Reardon's attempts to identify witnesses were inadequate. Stevens, 152 F. Supp. 2d at 571 & n.15. Assessing this claim, the District Court concluded that Reardon's failure to conduct an investigation to try to locate witnesses was objectively unreasonable and that Stevens was prejudiced by this failure to investigate. Id. at 580-81. To evaluate the District Court's conclusions, we turn to the two-pronged Strickland test.

We have held that "[t]he standard by which we judge deficient performance is an objective standard of reasonableness, viewed to the extent possible from the attorney's perspective at the time, without 'the distorting effects of hindsight.' " Duncan v. Morton , 256 F.3d 189, 200 (3d Cir. 2001) (quoting Strickland, 466 U.S. at 688-90). In addressing the reasonableness of an attorney's representation, a reviewing court must be deferential in its scrutiny "because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." Bell v. Cone , 122 S.Ct. 1843, 1854 (2002) (citing Strickland, 466 U.S. at 689). Furthermore, a party claiming ineffective assistance must identify specific errors by counsel, and the court must indulge a strong presumption that counsel's conduct was reasonable. Strickland, 466 U.S. at 690.

It happens that Strickland also involved an ineffectiveness claim relating to a duty to investigate. The Supreme Court did not offer any special standards concerning the duty to investigate, but it did say that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. A decision not to investigate must be directly assessed for "reasonableness in all the circumstances," and the habeas court must apply "a heavy measure of deference to counsel's judgments." Id. The Court's observations in Strickland speak to the issues raised in this case:

The reasonableness of counsel's actions may be

determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on

14

information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

Id. (emphasis added).

Reardon claimed that the only way to defend Stevens given the proof that there had been sexual contact between Stevens and Auterson was to argue that Auterson consented to sex with Stevens. The state courts accepted that strategy as reasonable. The District Court also concluded the strategy was reasonable but found that Reardon was deficient in how he carried out this reasonable strategy. In particular, the court noted that despite the fact that Reardon knew that he could not rely on Stevens to recount the events of the night in question, Reardon's affidavit merely states that he contacted the ten individuals that Stevens and his mother asked him to contact and that he interviewed Auterson's boyfriend.

In contrast to the District Court's view of Reardon's performance, the Delaware courts were satisfied with Reardon's affidavit. The Commissioner stated that Reardon "followed every lead given him by Stevens." Stevens, 1995 WL 465149, at *4. The Delaware Supreme Court similarly noted that Reardon's affidavit "avers that he investigated all of the leads provided to him by Stevens." Stevens v. State, No. 95-323, 1996 WL 69769, at **2 (Del. Jan. 24, 1996).

The District Court concluded that the Delaware courts' characterizations of Reardon's affidavit were "rather generous," noting that "[Reardon] did not state that he 'followed' or 'investigated' the leads provided by Stevens" but "merely stated that the individuals that Stevens and his mother identified were 'contacted by me, either personally

15

or by phone.' " Stevens, 152 F. Supp. 2d at 575 (quoting Appellants' Appendix at 12, Stevens (No. 95-323)). The court remarked that Reardon's affidavit "gives no clue as to the extent of these 'contacts,' or whether the information he

learned in this manner either encouraged or discouraged further investigation." Id. The District Court also observed that neither the Commissioner nor the Delaware Supreme Court "acknowledged Stevens' contention that Reardon failed to hire a private investigator as promised," nor mentioned Reardon's "alleged failure to follow up on the leads provided by Theodorakos." Id. The District Court noted that the "state courts seemed quite impressed by Reardon's rather unimpressive response to Stevens' allegations." Id.

The District Court further disagreed with the implication by the Delaware state courts that the extent of Reardon's investigation was reasonable in light of Stevens' claimed memory lapse. Although the District Court recognized that Strickland instructs that the degree of investigation that is reasonable depends in large part on the information provided by the defendant, Strickland, 466 U.S. at 691, the District Court believed that "Stevens' asserted lack of memory should have heightened Reardon's duty to conduct an independent investigation and to follow up on the leads provided by Theodorakos." Stevens, 152 F. Supp. at 575. The court stated that "given Stevens' memory lapse, it would seem less reasonable to do no more than follow up on leads that he provided." Id.

The District Court further disagreed with the Commissioner's apparent satisfaction with Reardon's attempts to undermine Auterson's credibility on cross-examination by calling " 'witnesses who testified that Stevens and the victim were seen dancing together that evening.' " Id. (quoting Stevens , 1995 WL 465149, at *4). The District Court noted that only one witness, Cates, testified that she saw them dancing, but that was in a group rather than one-on-one. Inasmuch as this was "far short of the allegations contained in the private investigators' interview notes attached to Stevens' motion," the court commented that "[s]urely, Reardon could not have reasonably concluded that the availability of Cates' testimony obviated the need for further investigation." Id.

16

The District Court cited our decision in United States v. Gray, 878 F.2d 702 (3d Cir. 1989), for the proposition that "[a]n attorney's performance is deficient when he or she fails to conduct any investigation into exculpatory evidence and has not provided any explanation for not doing so." Stevens, 152 F. Supp. 2d at 576. The District Court held that Reardon's efforts fell short of minimally acceptable professional standards and therefore found that the state courts' conclusion to the contrary was unreasonable. Id. at 577.

On appeal, the State takes issue with several of the District Court's findings. First, the State argues that the District Court improperly assigned the burden of proof under Strickland by independently reweighing the substance of the affidavit presented by Reardon in the state

post-conviction action. Reardon stated in the affidavit that he "contacted" all the potential witnesses identified by Stevens either personally or by phone. The state courts had described Reardon's affidavit as stating that Reardon had "followed" or "investigated" leads provided by Stevens, whereas the District Court made a point of the distinction between the meaning of the word "contacted," used by Reardon, and the words "followed" or "investigated," used by the state courts. According to the State, this constituted reweighing by the District Court. Br. of Appellants at 21-22.

The State also argues that the District Court erred in drawing an adverse inference from defense counsel's inability to recall specific details of his representation of Stevens more than nine years after the trial, and emphasizes that it was Stevens, the habeas petitioner, who had the burden of establishing his right to relief and all facts necessary to show a constitutional violation. Br. of Appellants at 23-24.

The State also argues that the District Court misapplied the Strickland test, and therefore erred in concluding that Reardon's performance was deficient. The State notes that the relevant inquiry under Strickland is not whether other investigatory avenues were available but whether defense counsel's choices were reasonable at the time he made them. We find most persuasive the State's argument that Reardon had no duty to investigate witnesses who

17

contradicted his own client's testimony. Stevens' testimony at trial was that he remembered events inside the bar as well as leaving the bar alone, but that he had no recollection of any events after leaving the bar. Therefore, the State argues that it was not unreasonable for Reardon to limit his investigation in light of Stevens' own statements.

As the Supreme Court held in Strickland, it is reasonable and proper for counsel to make strategic choices about both trial strategy and pre-trial investigation in light of information supplied by a client. Strickland, 466 U.S. at 691. Although in some rare instances counsel may decide to take the unusual step of impeaching his or her own client, it is not unreasonable for a lawyer to decide to pursue investigatory avenues and trial strategies that are consistent with the client's account of the events in question, especially if the client plans to offer sworn testimony regarding those events.

Under the circumstances of this case, there was no reason why Reardon should have considered contradicting his client's recollection of the events inside Mr. D's. Stevens recalled many specific events inside the bar. He testified that he did not dance with or otherwise have contact with Auterson inside Mr. D's that night. Significantly, the testimony of Auterson, the victim, was in complete accord with that of Stevens in this respect.

The state courts' conclusion that Reardon's strategy satisfied the first prong of Strickland was not unreasonable under the AEDPA standard of review because Reardon conducted his investigation and shaped his trial strategy around Stevens' account. The facts that Stevens apparently had no recollection of the events of the evening after he left the bar and that he was "fairly certain" that he left the bar alone, App. at 46, were not inconsistent with his testimony about what occurred that night before he blacked out and there was therefore no reason why Reardon should have crafted his pre-trial and trial strategies in a way that in effect completely undermined Stevens' recollections.

Had Reardon sought to present a persuasive defense of Stevens at trial on the theory that Auterson and Stevens

18

had met at the bar, socialized there and left together, and thus were voluntary social companions, he would have had to try to impeach both his own client and the prosecution's principal witness, the alleged victim. No case holds that Strickland requires that counsel pursue such a strategy. It follows that the state courts were not unreasonable in holding that Reardon's failure to pursue an investigation of the events in the bar did not render his representation of Stevens deficient.

Our decision in Gray, on which Stevens relies, is not inconsistent with this conclusion. Gray was arrested by police officers who, having been called to the scene of a fight, discovered a firearm and ammunition in Gray's pocket. Gray, 878 F.2d at 704-05. Gray was charged with possession of a firearm as a convicted felon in violation of federal law. Gray presented an affirmative defense of self-defense, arguing that he took the firearm from an assailant during a fight in order to prevent the assailant from carrying out a threat to use the gun against him. Gray's counsel made no effort to investigate the case. He did not attempt to interview any of the more than twenty eyewitnesses to the fight between Gray and his assailant, many of whom would have been easy to locate. Further, Gray's counsel made no efforts to contact an especially significant eyewitness to the fight, the mother of Gray's child and the then-girlfriend of Gray's assailant. Id. at 714.

Counsel's primary excuse at trial was that Gray did not want to subpoena witnesses and force them to testify. We observed that "Gray's reluctance to subpoena witnesses . . . did not absolve [his counsel] of his independent professional responsibility to investigate what information . . . potential witnesses possessed." Id. at 712. Moreover, we noted that Gray's hesitance to subpoena witnesses was based on inaccurate information, as Gray's counsel did not inform him (because counsel did not himself know) that subpoenaed witnesses would have been paid for their time. Id. at 709.

We found that Gray's counsel performed "below the minimum standard of reasonable professional representation," id. at 712, because"[c]ounsel offered no strategic justification for his failure to make any effort to

investigate the case, and indeed he could have offered no such rationale," id. at 711. We reached this conclusion while adhering to the rule of Strickland that:

> [i]n the context of defense counsel's duty to investigate, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." The reasonableness of counsel's actions may be affected by the defendant's actions and choices, and counsel's failure to pursue certain investigations cannot be later challenged as unreasonable when the defendant has given counsel reason to believe that a line of investigation should not be pursued.

Id. at 710 (quoting Strickland, 466 U.S. at 690-91) (emphasis added).

We note first that Gray was a direct appeal of a federal conviction, over which our review is broader, and was decided before passage of AEDPA. Moreover, there is a significant difference in counsel's failure to investigate in Gray and that alleged in the present case. Although Reardon concededly did not conduct as thorough an investigation as he might have, unlike Gray's counsel he did make some investigatory inquiries. Further, whereas Gray's counsel lacked any strategic reason for not conducting an investigation, Reardon had, as the state courts found, a straightforward and legitimate reason for not pursuing certain lines of inquiry as part of his investigation. Most significant, there was a risk of conflict between Stevens' recollection and that of the potential witnesses that Stevens claims Reardon should have pursued. Stevens, in contrast to Gray, did give his counsel "reason to believe that a line of investigation should not be pursued." Id. (citing Strickland, 466 U.S. at 691).

Accordingly, we agree with the state's contention that the application by state courts of the Strickland  standard was not objectively unreasonable. The District Court's decision to the contrary was erroneous.4 We will accordingly reverse the court's grant of a writ of habeas corpus.

_____

4. In light of our conclusion that counsel's performance was not deficient, we need not reach the prejudice prong of the Strickland

IV.

CONCLUSION

For the reasons given herein, the District Court's decision conditionally granting a writ of habeas corpus to Stevens will be reversed.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

_____

inquiry.

21