**Anthony BAKER, Appellant**

v.

**George N. PATRICK, Superintendent; The District Attorney of the County of Philadelphia; The Attorney General of the State of Pennsylvania.**

No. 07–1766.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) Sept. 17, 2009.

Filed Sept. 18, 2009.

Anthony Baker, Houtzdale, PA, pro se.

Thomas W. Dolgenos, Office of District Attorney, Philadelphia, PA, for Appellees.

Before: SLOVITER, FUENTES and SMITH, Circuit Judges.

## OPINION

SLOVITER, Circuit Judge.

Anthony Baker was convicted after a jury trial in the Court of Common Pleas of Philadelphia of third degree murder, conspiracy, and possession of an instrument of crime. He appeals the District Court's denial of his petition for habeas corpus made on the ground that his trial counsel was ineffective for failing to interview and call at trial two potential alibi witnesses. We will affirm.

### I.

#### Background

A. The Trial Court Proceedings

James Ward was murdered when two assailants shot him as he walked with three men on a Philadelphia street.

On two occasions—first just after the murder and again several months later—Cleveland Scott, one of the men with whom Ward was walking, told detectives that he could not identify the assailants. However, he later identified from an array of photographs Tyreek Corbett and petitioner Baker, whom Scott had known for nine years, as the gunmen. At trial, Scott explained that his earlier statements to detectives were intentionally false because he feared retaliation.

Another witness, Marion Cooper, claimed that she, too, could identify the shooters from her vantage point through a second floor window in a nearby abandoned house. During her first interview by detectives, Cooper falsely identified two random men from the photographs that she was shown but later, like Scott, identified the real gunmen as Corbett and Baker. At trial, Cooper claimed that she had lied because she was frightened and had not wanted to get involved.

The court sentenced Baker to an aggregate of ten to twenty years of imprisonment.

### B. The PCRA Proceedings

Baker filed a pro se petition under the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa. Cons.Stat. §§ 9541–9546, in relevant part arguing that trial counsel was ineffective for failing to interview and present at trial two purported alibi witnesses: Nakia Thrones, Baker's live-in girlfriend at the time of the murder, and her sister, Takena Thrones. The PCRA Court held a hearing over three days and took testimony from the Thrones sisters, from Baker, from Baker's mother, and from Baker's trial counsel, Mark Greenberg.

Baker testified that, pre-trial, he had given Greenberg the Thrones sisters' names as potential alibi witnesses, as well as the name of a friend named Cody who had visited Baker the day of the murder. Baker stated that he never told police about his alibi because it was only "during [his] incarceration" after "sitting and thinking about it over and over again" that he remembered that he had been in Nakia's apartment the night of Ward's murder and that Takena had visited and told them that Ward had been shot. PCRA Tr. 11, Mar. 19, 2003. According to Baker, Greenberg had advised him not to call Nakia or Takena at trial because their close relationship with Baker and the one year time lapse between the date of the murder and the date when Baker was arrested would expose them to damaging impeachment. Baker admitted that he had agreed with Greenberg's strategy to focus instead on undermining the prosecution's case.

Sandra Baker, Baker's mother, testified that she, too, told Greenberg about the Thrones sisters. Ms. Baker admitted, however, that she never introduced Nakia to Greenberg as an alibi witness even though she and Nakia had attended the trial together. Ms. Baker further acknowledged that, although she had addressed the quality of the Commonwealth's case before the sentencing court, she did not mention any alibi witnesses.

Nakia testified generally that she was at home with Baker at the time of the murder. She also stated that one day, when she had jury duty, she stopped by Baker's trial to "see what was going on" and met Greenberg, but that she did not discuss the alibi with him. PCRA Tr. 46, Mar. 19, 2003. She claimed that she did not tell the police that she could provide Baker an alibi because she "did not take [the murder charge] seriously because they probably could not get [Baker] on another charge and this was just an attempt to keep him incarcerated." *Id.* at 51.

Takena testified that she first became aware that Baker had been charged with Ward's murder when she read about his conviction in the newspaper. She also asserted that on the night of the murder, she was at a friend's house when they heard shots close enough that they "jumped down" to the floor and then looked out the window. About "two minutes" later, Takena left that apartment to meet a friend who was giving her a car ride to Nakia's home. *Id.* at 39. On the way, they passed the scene of Ward's murder where friends informed her that Ward had been shot. When she arrived at Nakia's apartment, Takena told Nakia and Baker that Ward had been gunned down.

Greenberg testified that he had no recollection of being given the names of alibi witnesses. He emphasized that he had interviewed all of the individuals whose names he was given. Baker's counsel produced a letter dated March 2, 1998 from Greenberg to Baker in which Greenberg quoted Baker as having said that he was "with Nikia [sic] . . . at the time of the shooting with an individual named Coty [sic] LNU," and had "heard from three different sources the day after the shooting that [Ward] had gotten shot." App. at 104. When asked if this refreshed his memory, Greenberg said:

> [A]s I stand here today five years later, I don't remember whether or not I spoke to [Nakia]. I can say, however, that Mrs. Baker . . . was very involved in this case and very involved in giving me witnesses to interview; and I can only assume . . . that . . . I would have interviewed Nikia [sic] based on Mrs. Baker's involvement. . . .

PCRA Tr. 5, Mar. 9, 2003. The Court asked Greenberg point-blank whether "[i]f he had been given the name 'Nikia' [sic] as a possible alibi witness, [he] certainly would have conducted an investigation and interviewed that person[?]" *Id.* at 6.

Greenberg answered "Yes," explaining that it was his "given practice" that "if there's a witness who has to be interviewed, [he] will interview that witness." *Id.* For further support, Greenberg referenced a March 9, 1998 memo from himself to Baker stating that Greenberg had interviewed Cody and that Cody had told him that, on the night of the murder, Cody and Baker were together at Baker's apartment watching television and smoking marijuana. In that same memo, Greenberg also noted that Cody's version of events was "contrary to [Baker's] statement . . . that he was with his girlfriend as well," and requested that Baker "review [the] memo carefully, and get back to [him] with . . . comments." App. at 107–08.

Greenberg testified that he would not have put on a witness whom he found to be incredible even if what she stated might appear "on paper" to help the defense because she might, in the end, make the defendant look bad. PCRA Tr. 11, Mar. 18, 2003. Greenberg speculated that Nakia's testimony would have done just that because, as he had advised Baker, the jury would have seen her as biased and questioned her ability to remember that night after a year-long time lapse.

Applying Pennsylvania law for ineffective assistance of counsel, which the parties recognize is materially the same as federal law, compare *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) with *Commonwealth v. Cox*, 581 Pa. 107, 863 A.2d 536, 543 (2004), the PCRA Court denied Baker's petition on three grounds: first, that Baker had agreed with Greenberg's trial strategy; second, that Greenberg had a reasonable basis not to call the Thrones sisters, i.e., their testimony would appear incredible and biased; and third, that, given the eye-witnesses' testimony, the Thrones sisters' testimony would not have changed

the outcome at trial. The Superior Court of Pennsylvania summarily denied Baker's appeal.

### C. The District Court Proceedings

Baker's pro se petition for writ of habeas corpus made in the federal district court was referred to a magistrate judge who recommended denial without an evidentiary hearing and denial of a certificate of appealability. Baker objected to the recommendation that his ineffective assistance of counsel claim be denied, arguing that the PCRA Court unreasonably applied *Strickland* to his case and unreasonably determined that Greenberg had investigated the Thrones sisters as potential witnesses. The District Court held that "[a] reasonable fact-finder, discounting the Thrones's testimony, could find that [Greenberg] acted in accordance with his normal practice of investigating all known witnesses," that Greenberg's decision not to put on unreliable alibi witnesses was objectively reasonable, and that the record supported the PCRA Court's holding that Baker could not show prejudice. App. at 16. The District Court overruled Baker's objections, denied the writ, and declined to issue a certificate of appealability.

This court granted Baker's motion for a certificate of appealability on the following issue: "whether appellant's trial attorney was ineffective for failing to investigate or call Takena and Nakia Thrones as witnesses."

### II.

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 2241 and 2254 and this court has jurisdiction under 28 U.S.C. §§ 1291 and 2253. Our review of the District Court's denial of habeas relief is plenary. *Jacobs v. Horn*, 395 F.3d 92, 99 (3d Cir.2005). Under 28 U.S.C. § 2254(d), as amended, Baker's petition cannot be granted unless the state court proceedings "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." The clearly established Federal law here is the *Strickland* standard for ineffective assistance of counsel under which Baker must show "(1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's error, the result would have been different." *Rolan v. Vaughn*, 445 F.3d 671, 681 (3d Cir.2006) (quotation omitted). Factual determinations made in the state proceedings are "presumed to be correct," a presumption that Baker must rebut by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. In light of the evidence provided at the PCRA hearing, the PCRA Court's holding that Greenberg was reasonable in choosing to attack the exploitable weaknesses in the Commonwealth's case, including the initial false identifications given by Cooper and Scott, rather than present incredible alibi witnesses was a reasonable application of federal law.

Even assuming that Greenberg failed to interview the Thrones sisters, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052. Greenberg interviewed Cody and found that his story did not match with Baker's. Greenberg then asked Baker to comment on the differences. Baker does not claim to have done so. "[T]he

degree of investigation that is reasonable depends in large part on the information provided by the defendant." *Stevens v. Del. Corr. Center,* 295 F.3d 361, 371–72 (3d Cir.2002). "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments," *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052, and "viewed … from the attorney's perspective at the time," *Duncan v. Morton,* 256 F.3d 189, 200 (3d Cir.2001) (quotation omitted).

After review of the record and the arguments of counsel, we cannot conclude that the District Court erred in holding that the state court reasonably applied the *Strickland* standard in denying Baker's petition for a writ of habeas corpus.

### III.

For the above-stated reasons, we will affirm the District Court's denial of the writ.